UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

| | |
|---|---|
| S&G LABS HAWAII, LLC, A HAWAII LIMITED LIABILITY COMPANY, | CIV. NO. 19-00310 LEK-WRP |
| Plaintiff, | |
| vs. | |
| DARREN GRAVES, LYNN PUANA, M.D., STEFANIE BADE-CASTRO, | |
| Defendants. | |

## <u>ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION</u>

On June 19, 2019, Plaintiff S&G Labs Hawaii, LLC ("Plaintiff") filed its Motion for Preliminary Injunction ("Motion"). [Dkt. no. 12.] An evidentiary hearing on the Motion was held on August 30, 2019. Plaintiff and Defendant Darren Graves ("Defendant") each filed a post-hearing brief on September 9, 2019. [Dkt. no. 46, 47.] On September 25, 2019, an entering order was issued informing the parties of the Court's ruling on the Motion. [Dkt. no. 55.] The instant Order supersedes that entering order. Plaintiff's Motion is hereby denied for the reasons set forth below.

## <u>BACKGROUND</u>

Plaintiff filed its Complaint on June 13, 2019, alleging: a claim under the Defend Trade Secrets Act, 18 U.S.C. §§ 1832, 1836(b)(1); a claim under the Hawai`i Uniform Trade

Secrets Act, Haw. Rev. Stat. Chapter 482B; and a breach of
contract claim.  [Dkt. no. 1 at pgs. 9-11.]  At the time
Plaintiff filed the instant Motion, Defendant was Plaintiff's
Chief Business Development Officer and Senior Account
Representative.  [Motion, Decl. of Lynn Puana, M.D., dated
6/12/19 ("6/12/19 Puana Decl.") at ¶ 7; Submission by Pltf. of
Witness Decls. in Lieu of Direct Examination re Motion for
Preliminary Injunction ("Pltf.'s Direct Decls."), Decl. of
Lynn Puana, M.D., dated 8/15/19 ("8/15/19 Puana Decl.") at
pg. 1.]  The instant case arises from a dispute between
Dr. Puana and Defendant regarding the negotiation of his new
employment contract.  Dr. Puana is Plaintiff's owner and Chief
Executive Officer.  She supervises all of Plaintiff's employees,
including the Account Representatives.  [6/12/19 Puana Decl. at
¶ 2.]  She is a physician licensed to practice in Hawai`i, and
she owns a medical practice – Big Island Pain Center ("BIPC") –
in Hilo, Hawai`i.  [8/15/19 Puana Decl. at pg. 7.]

        Dr. Puana hired Defendant in March 2017.  His contract
provided for a base monthly salary, with commissions related to
the revenues generated by him and by the other account
representatives who he supervised.  [Id. at pg. 2;[1] Def.'s

_____

        [1] The 8/15/19 Puana Declaration states that a copy of
Defendant's contract, signed on March 5, 2017, is attached,
                                        (. . . continued)

2

Submission of Decls., filed 8/15/19 (dkt. no. 32), Decl. of

Darren Graves ("Graves Decl."), Exh. A (Employment Agreement) at

7 (Schedule A - Compensation).] Defendant's Employment

Agreement states:

7. **Restrictive Covenants**

(a)  During the Employee's employment with the Company, the Employee will not, directly or indirectly, individually or as a consultant to, or an employee, officer, director, manager, stockholder, partner, member or other owner or participant in any business entity, other than the Company, engage in or assist any other person or entity to engage in any business which competes with the Company's Business, regardless of where that business is located, unless mutually agreed upon and documented.. [sic]

(b)  Employee shall have no obligations under Section 7(a) beyond the period of his employment by the Company.

(c)  During the Employee's employment with the Company, whether or not under this Agreement, and at all times thereafter, the Employee will not, directly or indirectly, make any disparaging statement, written or oral, about the Company or any of its practices, affiliates, directors, officers, employees, stockholders, managers, members, partners, agents, attorneys or representatives.  This Section shall not, however, prohibit Employee from testifying truthfully as a witness in any court proceeding or governmental investigation or from exercising in good faith such party's rights under this Agreement, any other Agreement or applicable law.

(d)  Employee shall not, either during the term of this Agreement or within 2 years after

_____

[8/15/19 Puana Decl. at pg. 2,] but no exhibits were filed with the declaration.

3

> termination, solicit any Company employees to
> leave the Company's employment, other than
> Brant Mauk, Joy Espresion, Trillium Simington,
> Tim Severin, Conrad Nerveza and Megan Rogers.
>
> . . . .

[Graves Decl., Exh. A at 2-3 (emphasis in original).] Except

for being unable to solicit most of Plaintiff's employees to

another company for two years, Defendant is not contractually

prohibited from working with one of Plaintiff's competitors

after he is no longer employed with Plaintiff.

In late 2018 or early 2019, Dr. Puana was informed

about the passage of the Substance Use-Disorder Prevention that

Promotes Opioid Recovery and Treatment for Patients and

Communities Act of 2018, which included the Eliminating

Kickbacks in Recovery Act ("EKRA").[2] [8/15/19 Puana Decl. at

pgs. 2-3.] Dr. Puana decided that the compensation of her

account representatives had to change because EKRA could be

interpreted as prohibiting "contractual arrangements with sales

staff which calculated compensation on the basis of a commission

linked to the number of tests performed, or the revenue received

by the laboratory from such testing," when the testing involved

Medicare or Medicaid funds. [Id. at pg. 3.] The account

representatives' new compensation structure would no longer be

---

[2] The EKRA is Subtitle J of the larger act. Pub.
L. 115-271, 132 Stat. 3894, 3900 (2018).

tied to Plaintiff's testing revenue.  Instead, they would

receive a fixed annual salary, with a discretionary bonus to be

determined by Dr. Puana on a quarterly basis.  Dr. Puana

acknowledges that, under the new compensation structure,

Defendant and the other account representatives would have lower

annual compensation, but she points out that, under the new,

salary-based structure, she and Plaintiff bore almost all of the

risk that a sales employee may perform poorly.  [Id. at pg. 4.]

Dr. Puana discussed the upcoming changes with the

account representatives, and she arranged a conference call for

them with her legal advisor so that they could understand the

reasons for the changes.  Proposed contracts, incorporating the

new compensation terms and revised non-compete clauses, were

distributed to the affected employees in early May 2019.

Dr. Puana knew Defendant was unhappy with the changes to his

employment agreement, especially the non-compete clause.  In the

course of negotiations between Defendant's attorney and

Plaintiff's legal advisor,[3] Dr. Puaua learned that Defendant: was

discussing possible employment with a competitor; and attempting

to persuade other account representatives not to sign the new

_____

[3] It is unclear from Dr. Puana's declarations whether
Louisiana attorney David Vaughn, Esq., was representing either
Dr. Puaua or Plaintiff during this time.  However, Defendant
refers to Mr. Vaughn as Plaintiff's General Counsel.  [Graves
Decl. at ¶ 10.]

employment contracts and to consider leaving with him to work for one of Plaintiff's competitors. [Id. at pgs. 3-5.]

Two other account representatives told Dr. Puana that Defendant: asked them to go with him to work for one of Plaintiff's competitors; and disclosed confidential information about Plaintiff, such as "information about [Plaintiff's] compensation methodology for [its] sales force, information about [its] internal operations, capacity, testing methodology, customer identities, customer volume, and unique customer needs." [Id. at pg. 5.] Dr. Puana asserts Defendant violated his employment agreement by: disclosing confidential information about Plaintiff; participating in business with, or otherwise assisting, one of Plaintiff's competitors; attempting to stop other sales representatives from signing their new employment contracts; and offering to bring Plaintiff's clients and Plaintiff's information about those clients to one of Plaintiff's competitors. Id. at pgs. 5-6; see also Graves Decl., Exh. A at 2, § 6 (Confidentiality and Patient Privacy), 2-3, § 7 (Restrictive Covenants).

Dr. Puana's ex-husband and former business partner, Dr. Rudy Puana was indicted for trafficking controlled substances. [8/15/19 Puana Decl. at pg. 7.] After the indictment, Defendant "aggressively questioned" Plaintiff's employees about: whether Dr. Puana knew about her ex-husband's

illegal acts, either at the time of the acts or thereafter; and whether she gave false statements to investigators.  [Id.] Starting in March 2019, Dr. Puana had to address apparent rumors among some of Plaintiff's customers, many of which were Defendant's accounts.  Plaintiff lost some of its customers during that period, including its largest customer, which was one of Defendant's accounts.  However, Dr. Puana does not know those customers' reasons for taking their business elsewhere. [Id. at pgs. 7-8.]  During the same period, Dr. Puana learned that Defendant made "personal derogatory and sexually demeaning comments" about her to Plaintiff's employees.  [Id. at pg. 8.] She does not know whether Defendant made similar comments outside of the company.  [Id. at pg. 9.]

Dr. Puana believes Defendant thinks she has not given him sufficient credit for what he perceives as his role in Plaintiff's success.  When Defendant told her he wanted to acquire an interest in the company, she told him that would not happen.  However, Dr. Puana later learned that some of Plaintiff's clients, including a client that was Defendant's account, believed that Defendant was a co-owner of the company. [Id. at pgs. 8-9.]

Because she suspected Defendant was making disparaging sexual comments about her outside of the company, Dr. Puana consulted with counsel and ultimately decided to remove

Defendant from his sales position and suspend his employment. [Id. at pg. 9.]  At the time of the 8/15/19 Puana Declaration, Defendant stated he had not been terminated, and he was still receiving a salary.  [Id. at pgs. 6-7.]  Defendant's employment contract provides for a large severance payment if Plaintiff terminates him without cause.  See id. at pg. 6; Graves Decl., Exh. A at 4, § 10(c) (Termination by Company Without Cause).

Stephanie Bade-Castro ("Bade-Castro") met Defendant in 2012 or 2013, when he was working for Millennium Health ("Millennium") as a sales representative.  However, Defendant later separated from Millennium.  He could not work for a Millennium competitor for one year after his separation due to a non-compete provision in his contract.  During that period, Defendant persuaded Bade-Castro's husband, Raul Castro, to become a sales representative for Precision Toxicology ("Precision").  Defendant said he intended to work for Precision after his non-compete period was over, and he would help her husband get started by establishing clients for Precision on the Island of Hawai`i.  The clients he intended to pursue were his accounts while he was with Millennium.  Raul Castro did not like the sales position, and Bade-Castro later took his position with Precision.  Defendant and Bade-Castro worked together at Precision for more than three years.  [Pltf.'s Direct Decls.,

Decl. of Stephanie Bade-Castro, dated 8/15/19 ("8/15/19 Bade-Castro Decl.") at pgs. 2-4.]

Bade-Castro and Defendant began working with Plaintiff on the same day. According to Bade-Castro, Defendant "immediately began to service on behalf of [Plaintiff] many of the clients that [he] had previously serviced while working for Precision." [Id. at pg. 5.] Defendant and Dr. Puana were in discussions about Defendant's change of employment for approximately a year before that. [Id. at pg. 4.] Defendant told Bade-Castro Dr. Puana knew that he and Bade-Castro were a "team" and that they would move to Plaintiff together. [Id.] In early 2017, while they were still working for Precision, Defendant told Bade-Castro that she should tell her clients on the Island of Hawai`i about her upcoming change in employment and she should talk to them about moving their business to Plaintiff. Defendant told her he had already begun having those conversations with his clients. [Id.]

Bade-Castro gave testimony consistent with Dr. Puana's testimony about: 1) Defendant's dissatisfaction with the new employment contract, Dr. Puana's management of the company, and her failure to credit his contribution to the company's success; 2) Defendant's disparaging and sexually explicit comments about Dr. Puana; and 3) Defendant's opinions about Dr. Rudy Puana's indictment. [Id. at pgs. 5-8.] Bade-Castro also testified that

Defendant represented to Plaintiff's clients that he and Dr. Puana were partners in the company. [Id. at pg. 7.]

When Bade-Castro initially received her proposed new employment contract, she was concerned about the addition of the non-compete clause, but she felt the changes as a whole were fair. [Id. at pgs. 8-9.] Bade-Castro testified that Defendant tried to convince her not to sign the new contract and that they should "stick together" and be a "team" in resisting the changes. [Id. at pg. 9.] Defendant even attempted to use his prior relationship with Raul Castro to convince her not to sign the new contract. [Id. at pg. 10.] Bade-Castro ultimately decided not to join Defendant in his efforts to resist the new contract. [Id. at pg. 9.] At the evidentiary hearing, Bade-Castro testified that she signed her new employment contract and disassociated herself from Defendant. [8/30/19 hrg. trans., filed 9/23/19 (dkt. no. 54), at 57, 61-62.]

Before Bade-Castro signed her new contract, Defendant told her he was talking with the owner of Aloha Toxicology ("Aloha Tox"), one of Plaintiff's competitors. Defendant told Bade-Castro on multiple occasions that he had talked to George, one Aloha Tox's owners. In May 2019, Defendant asked Bade-Castro to join him on a call with George. On June 7, 2019, he asked her to join him on a call with Dan, one of Aloha Tox's other owners. Bade-Castro declined both times. [Id. at

pg. 10.] However, after those calls, Defendant told Bade-Castro he described to them: Plaintiff's commission structure; the terms he wanted in order for him to change employment, including commission-based compensation and ownership options; Plaintiff's lab equipment; and Plaintiff's operations information, such as monthly volume and turn around time. [Id. at pgs. 10-11.] He also said one of the Aloha Tox owners claimed their lab could handle 2,000 additional testing samples per month, if Defendant could bring that much additional business when he changed employers. [Id. at pg. 11.] Bade-Castro testified Defendant told her he represented to Aloha Tox that he and she together could bring 2,000 samples per month to Aloha Tox from Plaintiff if they moved. [8/30/19 hrg. trans., filed 9/23/19 (dkt. no. 54), at 81.]

While he was negotiating with Aloha Tox, Defendant "became more consistently critical and derogatory in his descriptions of [Plaintiff's] management and ownership, especially with regard to Dr. Lynn Puana." [8/15/19 Bade-Castro Decl. at pg. 11.] At the hearing, Plaintiff's counsel made a proffer that Bade-Castro would testify Defendant told her he was going to take all of Plaintiff's clients and put Dr. Puana out of business, forcing her to fire all of Plaintiff's employees. For purposes of the instant Motion, the Court accepts

11

Plaintiff's proffer that Bade-Castro would give such testimony. [8/30/19 hrg. trans. at 93-94, 96.[4]]

Justin Gay ("Gay"), another of Plaintiff's account representatives, testified that he worked under Defendant's supervision when they worked for Plaintiff. [Pltf.'s Direct Decls., Decl. of Justin Gay ("Gay Decl.") at pg. 1.] Gay also worked for Millennium at the same time as Defendant, who was Millennium's sales representative in Hawai`i. Gay's understanding is that Millennium fired Defendant. Gay thereafter took over Millennium's Hawai`i clients, and he realized that Millennium clients were switching to Precision. Gay learned that Defendant's former Millennium accounts were solicited by Raul Castro, and Millennium lost several clients because of that solicitation. [Id. at pgs. 2-3.] According to Gay, "[t]his loss of customers did significant financial harm to Millennium's testing volume and revenue in Hawaii." [Id. at pg. 3.] Gay also states that, once Defendant began working for Precision, Defendant and Bade-Castro "worked as a sales team for Precision[], and were successful in taking to Precision[] many of Mr. Graves' clients from the time he was with Millennium."

---

[4] Plaintiff's counsel initially said Justin Gay made that statement, [8/30/19 hrg. trans. at 93,] but, based on the context of counsel's arguments, it is clear that was a mistake and Bade-Castro would testify Defendant made the statement described in the proffer.

[Id.] Gay stated that, when Defendant was negotiating his move from Precision to Plaintiff, Defendant contacted him about joining Plaintiff with Defendant and Bade-Castro. Gay gave similar testimony to Bade-Castro's testimony about Defendant's solicitation of his Precision clients to move to Plaintiff. [Id. at pgs. 3-4.] Gay eventually went to work for Plaintiff. See id. at pg. 5.

As to the new employment contracts proposed by Dr. Puana, Gay was initially surprised at how much his income would decrease because of the new terms. [Id. at pg. 6.] Gay stated he, Defendant, and Bade-Castro all initially resisted the changes to their employment contracts, although Defendant "was far and away the most strident in his opposition." [Id. at pg. 7.] According to Gay, he, Defendant, and Bade-Castro thought Dr. Puana was using the revision of the compensation terms, which she said was required by law, to insert additional terms that were favorable to Plaintiff, to their detriment. [Id.]

Gay testified that Defendant said he would be able to live off of his severance payment if Dr. Puana terminated his employment because he refused to sign the new contract. Defendant also said he would immediately try to lure Plaintiff's clients away to another company. [Id.] While Gay was deciding whether or not to sign the new contract, Defendant told Gay he

13

was in discussions with Aloha Tox about Defendant, Bade-Castro, and Gay moving to Aloha Tox. During that time, Defendant urged Gay not to agree to the new contract with Plaintiff. Defendant believed they had significant leverage if the three of them stayed together because Plaintiff would lose a large number of clients if the three of them left for another company. Based on his knowledge of Defendant's actions during the transition from Millennium to Precision and then from Precision to Plaintiff, Gay believes Defendant was already telling his clients with Plaintiff that he was planning to move to Aloha Tox. [Id. at pgs. 8-9.] Gay gave similar testimony to Bade-Castro about Defendant's criticism and derogatory comments about Dr. Puana. [Id. at pgs. 10-11.] After he learned Bade-Castro signed her new contract and after Dr. Puana agreed to the compensation terms he requested, Gay signed his new contract. [Id. at pg. 10.]

Defendant asserts that, before he went to work for Plaintiff, it had no more than four clients. After Defendant went to work for Plaintiff, sixty-five clients, with whom he had previous working relationships, took their business to Plaintiff. [Graves Decl. at ¶ 7.] According to Defendant, in the urine drug testing industry, "it is not unusual" for a client with whom an account representative has a good working relationship to follow the representative when the

representative changes employers.  [Id. at ¶ 8.]  Defendant

testified that Gay and Bade-Castro sought his help in the

negotiations with Dr. Puana regarding the new employment

contracts.  See, e.g., id. at ¶¶ 11-21, Exh. B (text messages

between Defendant and Gay from 4/3/19 to 5/30/19), Exh. E (text

messages between Defendant and Bade-Castro from 1/17/19 to

6/4/19), Exh. F (emails between Dr. Puana and Defendant, dated

4/29/19, regarding Bade-Castro's contract), Exh. G (emails

between Bade-Castro and Defendant, dated 5/8/19, regarding Bade-

Castro's contract).  According to Defendant, it was Gay who

suggested that they reach out to another laboratory about the

possibility of the three of them moving together.  Defendant

states he told Gay and Bade-Castro staying with Plaintiff was

the best option.  Gay and Bade-Castro agreed, but the three also

agreed that reaching out to another laboratory was a good idea,

in the event that their negotiations with Dr. Puana did not work

out.  [Graves Decl. at ¶ 35.]  According to Defendant, both Gay

and Bade-Castro were unhappy with the proposed employment

contracts, but they wanted to follow Defendant's lead in the

negotiations because he had retained an attorney to assist him.

[Id. at ¶ 42.]  Defendant did not sign any version of the new employment contract that Dr. Puana sent him.[5]  [Id. at ¶ 53.]

Defendant admits that, in mid-May 2019, he spoke with George Powell, a member at WHIC LLC, doing business as Aloha Toxicology, about possible employment with Aloha Tox.  Defendant also admits that he participated in a call in early June 2019 with George Powell and Daniel Hlavacheck ("Hlavacheck").  [Id. at ¶¶ 38-39.]  Hlavacheck states that, when he asked Defendant what volume of business he could bring with him if he joined Aloha Tox, Defendant said he could bring over 1,000 testing specimens a month.  [Def.'s Submission of Decls., Decl. of Dan Hlavacheck at ¶ 9.]  Hlavacheck assured Defendant Aloha Tox could handle up to 2,000 additional specimens a month.  [Id.] At the hearing, Hlavacheck testified that he did not ask Defendant if the 1,000 specimens Defendant referred to were from Plaintiff's clients or clients that were not being served by either Plaintiff or Aloha Tox.  [8/30/19 hrg. trans. at 47.] Defendant states:  "I have never discussed with a competitor of S&G, S&G's compensation or commission structure, equipment, internal systems or processes, business volume, or other information regarding S&G's internal operations.  Nor have I

_____

[5] The three drafts of the proposed employment contract that Dr. Puana sent to Defendant are contained within Exhibits C, D. and H to the Graves Declaration.

ever discussed any confidential information regarding S&G's clients with any potential competitor of S&G." [Graves Decl. at ¶ 40.]

Defendant specifically denies making derogatory statements about Dr. Puana, Plaintiff, or Plaintiff's employees during the May 2019 conversation with Powell. [Id. at ¶ 38.] According to Defendant, in his conversations with Gay and Bade-Castro: they were all angry at, and frustrated with, Dr. Puana and how she was handling the contract negotiations; they "made less-than-professional comments about" her; and they agreed with each other's negative comments. [Id. at ¶ 43.] However, Defendant denies making similar comments to anyone else. [Id. at ¶ 44.] For purposes of the instant Motion, the Court accepts defense counsel's proffer that Defendant would testify that he never made the statements described in Plaintiff's proffer. [8/30/19 hrg. trans. at 96.]

## STANDARD

This Court has described the standards that apply to a motion for a preliminary injunction as follows:

> "[I]njunctive relief is an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 129 S. Ct. 365, 376, 172 L. Ed. 2d 249 (2008). The standard for granting a preliminary injunction and the standard for granting a temporary restraining order are identical. See Haw.

> > Cnty. Green Party v. Clinton, 980 F. Supp.
> > 1160, 1164 (D. Haw. 1997); Fed. R. Civ. P.
> > 65.
>
> Sakala v. BAC Home Loans Servicing, LP, CV. No.
> 10-00578 DAE-LEK, 2011 WL 719482, at *4 (D.
> Hawai`i Feb. 22, 2011) (alteration in original).
>
> > A plaintiff seeking a preliminary injunction
> > must establish that he is likely to succeed
> > on the merits, that he is likely to suffer
> > irreparable harm in the absence of
> > preliminary relief, that the balance of
> > equities tips in his favor, and that an
> > injunction is in the public interest. Am.
> > Trucking Ass'ns v. City of Los Angeles, 559
> > F.3d 1046, 1052 (9th Cir. 2009) (quoting
> > Winter v. Natural Res. Def. Council, Inc.,
> > 555 U.S. 7, 129 S. Ct. 365, 374, 172 L. Ed.
> > 2d 249 (2008)) (explaining that, "[t]o the
> > extent that [the Ninth Circuit's] cases have
> > suggested a lesser standard, they are no
> > longer controlling, or even viable"
> > (footnote omitted)); see also Winter, 129 S.
> > Ct. at 374-76 (holding that, even where a
> > likelihood of success on the merits is
> > established, a mere "possibility" of
> > irreparable injury is insufficient to
> > warrant preliminary injunctive relief,
> > because "[i]ssuing a preliminary injunction
> > based only on a possibility of irreparable
> > harm is inconsistent with [the Supreme
> > Court's] characterization of injunctive
> > relief as an extraordinary remedy that may
> > only be awarded upon a clear showing that
> > the plaintiff is entitled to such relief").
>
> Painsolvers, Inc. v. State Farm Mut. Auto. Ins.
> Co., 685 F. Supp. 2d 1123, 1128-29 (D. Hawai`i
> 2010) (footnote and some citations omitted)
> (alterations in original). . . .

Pac. Radiation Oncology, LLC v. Queen's Med. Ctr., 47 F. Supp.

3d 1069, 1075 (D. Hawai`i 2014) (alterations in Pac. Radiation)

(some citations omitted).

## **DISCUSSION**

The gravamen of the Motion is the issue of whether Plaintiff is likely to suffer irreparable harm in the absence of a preliminary injunction. At the hearing, Plaintiff's counsel conceded, "[n]othing has actually happened yet," following Defendant's threat to put Plaintiff out of business. [8/30/19 hrg. trans. at 93.] Plaintiff's counsel characterized the Motion as a "prophylactic" measure, "trying to get ahead of the problem rather than have to live with the problem and then come [to this Court after the problem materializes to obtain] relief." [Id. at 89.] However, Plaintiff asserts that, because Dr. Puana's fear that Defendant will attempt to carry out his threat is reasonable, the fear is sufficient to support a finding that Plaintiff is facing imminent irreparable harm. There is recent Ninth Circuit case law supporting Plaintiff's position that the reasonable fear of being put out of business satisfies the irreparable harm requirement for a preliminary injunction. In hiQ Labs, Inc. v. LinkedIn Corp., the Ninth Circuit stated:

> "[M]onetary injury is not normally considered irreparable." Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League, 634 F.2d 1197, 1202 (9th Cir. 1980). Nonetheless, "[t]he threat of being driven out of business is sufficient to establish irreparable harm." Am. Passage Media Corp. v. Cass Commc'ns, Inc., 750 F.2d 1470, 1474 (9th Cir. 1985). As the Second Circuit has explained, "[t]he loss of . . . an ongoing

> business representing many years of effort and
> the livelihood of its . . . owners, constitutes
> irreparable harm.  What plaintiff stands to lose
> cannot be fully compensated by subsequent
> monetary damages."  Roso-Lino Beverage
> Distributors, Inc. v. Coca-Cola Bottling Co. of
> New York, Inc., 749 F.2d 124, 125-26 (2d Cir.
> 1984) (per curiam).  Thus, showing a threat of
> "extinction" is enough to establish irreparable
> harm, even when damages may be available and the
> amount of direct financial harm is ascertainable.
> Am. Passage Media Corp., 750 F.2d at 1474.

938 F.3d 985, 993 (9th Cir. 2019) (alterations in hiQ Labs).  In

hiQ Labs, there was evidence that the threatened loss of

business was more than "purely hypothetical."  Id. (stating

that, after hiQ Labs received a cease-and-desist letter from

LinkedIn, the financing round that hiQ Labs was going through

stalled, and hiQ Labs lost several employees).

     In contrast, there is no such evidence in the instant

case.  Defendant did not convince either Bade-Castro or Gay to

leave Plaintiff; they signed their new contracts and remain

employed by Plaintiff.  At the time of the hearing, Defendant

was still employed by Plaintiff, although he was suspended from

performing sales work.  [8/15/19 Puana Decl. at pg. 9.[6]]

Plaintiff did not present any evidence of losses that it

---

[6] Plaintiff represents that Defendant's employment was
terminated after the hearing, [Pltf.'s post-hearing brief at 3,]
but there is no admissible evidence of his termination.
Further, Defendant's termination is not relevant to the Court's
ruling on the instant Motion.

suffered, or are imminently facing, because of the disclosures
Defendant made, either to Aloha Tox, other competitors, or to
Plaintiff's customers. Although there was testimony that
Plaintiff lost some of its customers who were among Defendant's
accounts, there is no evidence establishing why those customers
took their business elsewhere. [Id. at pg. 8.] Thus, there is
no evidence that the loss of those customers was due to
Defendant's actions that form the basis of this lawsuit.

The Court can fully appreciate a business's concern
with the retention of its clients and employees, as well as the
maintenance of its capital and income. The Court does not
discount Plaintiff's concerns about Defendant's actions and
statements, and the effect that those actions and statements may
have in the future. However, the law requires more to obtain a
preliminary injunction. See Thompson v. Hawaii Dep't of Pub.
Safety, CIV. NO. 17-00235 LEK-KSC, 2017 WL 2841700, at *5 (D.
Hawai`i July 3, 2017) ("The propriety of a request for
injunctive relief hinges on a significant threat of irreparable
injury that must be imminent in nature. Speculative injury does
not constitute irreparable harm." (some citations omitted)
(citing Caribbean Marine Serv. Co. v. Baldridge, 844 F.2d 668,
674 (9th Cir. 1988))).

In addition, Defendant has testified that, during his
suspension, he was not permitted to have contact with

21

Plaintiff's clients who were formerly his accounts. During that time, Dr. Puana and Bade-Castro began to arrange meetings with those clients. [Graves Decl. at ¶¶ 50-51.] After those meetings, some of the clients contacted Defendant to find out whether he was still employed by Plaintiff because, during the meetings, Dr. Puana and/or Bade-Castro stated Defendant "would no longer be servicing them and/or that [he] had been 'let go.'" [Id. at ¶ 51.] Plaintiff has not presented any evidence contradicting this testimony. Defendant's testimony shows that Plaintiff are actively trying to prevent him from luring clients away from Plaintiff. Thus, even assuming that Defendant made the threat described in Plaintiff's proffer, his ability to carry out that threat is "purely hypothetical." See hiQ Labs, 938 F.3d at 993.

Plaintiff has therefore failed to establish that it is likely to suffer irreparable harm unless a preliminary injunction is granted. Because Plaintiff has not established irreparable harm, it is not necessary to address the other requirements for a preliminary injunction.

## CONCLUSION

On the basis of the foregoing, Plaintiff's Motion for Preliminary Injunction, filed June 19, 2019, is HEREBY DENIED.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAI`I, November 25, 2019.



/s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

**S&G LABS HAWAI`I, LLC V. DARREN GRAVES, ET AL; CV 19-00310 LEK-WRP; ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**