UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

|  |  |
|---|---|
| S&G LABS HAWAII, LLC, A HAWAII LIMITED LIABILITY COMPANY,<br><br>          Plaintiff,<br><br>     vs.<br><br>DARREN GRAVES,<br><br>          Defendant. | CIV. NO. 19-00310 LEK-WRP |

**<u>ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>**

Before the Court is Defendant/Counter Claimant/Third-Party Plaintiff Darren Graves's ("Graves") Motion for Summary Judgment ("Motion"), filed on November 4, 2020. [Dkt. no. 5.] Plaintiff/Counterclaim Defendant S&G Labs Hawaii, LLC ("S&G") filed its memorandum in opposition on December 28, 2020, and Graves filed his reply on December 31, 2020. [Dkt. nos. 102, 103.] This matter came on for hearing on January 15, 2021. Graves's Motion is hereby granted for the reasons set forth below. Although some of Graves's arguments were either rejected or were not considered by this Court, the Motion is granted in its entirety because Graves is entitled to summary judgment as to all of S&G's claims against him.

## BACKGROUND

### I.   Factual Background

S&G operates in Kona, Hawai`i.  Third-Party Defendant Lynn Puana, M.D. ("Dr. Puana"), is S&G's chief executive officer.  [Graves's concise statement of facts in supp. of Motion ("CSOF"), filed 1/4/20 (dkt. no. 96), at ¶¶ 1, 6; Mem. in Opp. at 2 (admitting CSOF ¶¶ 1-4, 6, 7, 9-14, 16-18, 31-34, 37-40, 42, and 44-45).]  Dr. Puana is also the sole owner of S&G. [Mem. in Opp., Decl. of Lynn Puana, M.D. ("Puana Decl.") at ¶ 2.]  S&G is a medical laboratory testing facility.  Relevant to this case, S&G performs urinalysis screening for legal substances, as well as for controlled substances for physicians, substance abuse treatment centers, and other types of organizations.  [Id. at ¶ 4.]  The parties agree that "[t]he urine drug testing industry is highly standardized and requires compliance with generally accepted industry practices and procedures to maintain required certifications."  [CSOF at ¶ 2; Mem. in Opp. at 2.]  According to Dr. Puana:

> 5.   S&G Labs is compensated for the testing services on a "per test" basis by third party insurers, government agencies under the Medicare and Medicaid programs, and direct "self-pay" by some individuals.  Payments are received on behalf of the individuals tested, not the "clients" who direct the individuals to S&G Labs for testing services.
>
> 6.   S&G Labs has no "contractual" relationships with the persons and entities that

are referred to as "Clients" - the physicians, substance abuse counseling centers, or other organizations in need of having persons tested. S&G Labs receives no compensation from physicians, substance abuse treatment centers, or other similar types of organizations who refer individuals for testing.  Those "clients" are free to cease using the services of S&G Labs and direct their patients to other medical lab testing companies at any time.

7.    The biggest factor in maintaining the relationship with these "clients" is their satisfaction with testing services provided, as competitors in the industry do not compete on the basis of "price."  The third-party insurers and government agencies unilaterally set reimbursement rates for lab testing under the plan participation agreements under which the persons being tested are covered.

[Puana Decl. at pgs. 2-3.]

A.    **Graves's Employment Agreement**

Graves was employed by S&G as a manager overseeing client accounts.[1]  His employment began on March 6, 2017, and his contract was valid until March 6, 2023.  [CSOF at ¶¶ 3-4; Mem. in Opp. at 2; CSOF, Decl. of Darren Graves ("Graves Decl."), Exh. A (Employment Agreement).]  Graves's compensation consisted of: a base annual salary of $50,000; thirty-five percent of the monthly net profits generated by his client accounts; and a portion of the thirty-five percent monthly net profits generated

_____

[1] Graves's position at S&G was the Business Development Manager, and he supervised the S&G sales team, [Puana Decl. at ¶ 2,] which consisted of Graves, Third-Party Defendant Stefanie Bade-Castro ("Bade-Castro"), and Justin Gay ("Gay"), [Mem. in Opp. at 3].

by the accounts handled by the S&G employees who Graves managed.
[Graves Decl., Exh. A at 1 (stating the compensation was
determined pursuant to Schedule A to the Compensation
Agreement); id. at 7 (Schedule A).]  Graves's Employment
Agreement also stated:

### 7. Restrictive Covenants

> (a)  During the Employee's employment with
> the Company, the Employee will not, directly or
> indirectly, individually or as a consultant to,
> or an employee, officer, director, manager,
> stockholder, partner, member or other owner or
> participant in any business entity, other than
> the Company, engage in or assist any other person
> or entity to engage in any business which
> competes with the Company's Business, regardless
> of where that business is located, unless
> mutually agreed upon and documented.. [sic]

> (b)  Employee shall have no obligations
> under Section 7(a) beyond the period of his
> employment by the Company.

> (c)  During the Employee's employment with
> the Company, whether or not under this Agreement,
> and at all times thereafter, the Employee will
> not, directly or indirectly, make any disparaging
> statement, written or oral, about the Company or
> any of its practices, affiliates, directors,
> officers, employees, stockholders, managers,
> members, partners, agents, attorneys or
> representatives.  This Section shall not,
> however, prohibit Employee from testifying
> truthfully as a witness in any court proceeding
> or governmental investigation or from exercising
> in good faith such party's rights under this
> Agreement, any other Agreement or applicable law.

> (d)  Employee shall not, either during the
> term of this Agreement or within 2 years after
> termination, solicit any Company employees to

leave the Company's employment, other than [six individuals who are not relevant to this case].

(e)  Employee agrees that during the term of this employment and for 2 years thereafter, he will not solicit the following existing or prospective clients: Puana Pain Clinic, BISAC (all locations), Lokahi (West, Waikoloa, and North locations), and Dr. McKenna's clinics on all islands.  Furthermore, during that same time frame Employee will not accept any of the aforementioned clients as clients of his own or clients of any company for which he works.  The Company agrees that except for these clients, employee may solicit the remaining, existing or perspective clients.

**8.  Remedies.**  Without limiting the remedies available to the Company, the Employee acknowledges that a breach of any of the covenants contained in Sections 6 or 7 herein could result in irreparable injury to the Company for which there might be no adequate remedy at law, and that, in the event of such a breach or threat thereof, the Company shall be entitled to obtain a temporary restraining order and/or a preliminary injunction and a permanent injunction restraining the Employee from engaging in any activities prohibited by Sections 6 or 7 herein or such other equitable relief as may be required to enforce specifically any of the covenants of Sections 6 or 7 herein.  Employee agrees that if any of the restrictive covenants contained in the noncompete section of this Agreement are determined by a court of law to be overly broad, that their desire is for the court to reform the restrictive covenants and enforce them to the extent allowed by law.

[Graves Decl., Exh. A at 2-3 (emphases in original).]  Dr. Puana admits the Employment Agreement did not have a traditional non-compete provision, and therefore Graves could immediately go to

work for an S&G competitor if he left S&G.  [Puana Decl. at ¶ 21.]

### B.   Attempted Negotiation of a New Agreement

In early 2019, S&G General Counsel David Vaughn ("Vaughn") told Dr. Puana about the Substance Use - Disorder Prevention that Promotes Opioid Recovery and Treatment for Patients and Communities Act of 2018, which took effect on November 1, 2018.  Vaughn told her that one of the components of that legislation - the Eliminating Kickbacks in Recovery Act ("EKRA") - sought to prevent the medical testing industry from using incentive-based compensation agreements, *i.e.*, agreements where a laboratory employee's pay is related to the number of tests that the laboratory performs.[2]  Vaughn advised Dr. Puana that, under EKRA, she could face criminal penalties, including up to ten years of imprisonment, if she continued to follow the S&G sales team's existing employment agreements, which based the sales employees' compensation on the number tests that S&G performed.[3]  [Puana Decl. at ¶¶ 14-15.]

The parties agree that:

---

[2] The EKRA is Subtitle J of the larger act.  Pub. L. 115-271, 132 Stat. 3894, 3900 (2018).

[3] S&G represents that the maximum penalty per violation of EKRA is ten years of imprisonment and a $200,000 fine.  [Mem. in Opp. at 4 (some citations omitted) (citing 18 U.S.C. § 220(a)).]

-in March or April 2019, Dr. Puana informed the S&G account executives that she intended to revise their employment agreements, as required by EKRA;[4]

-in April 2019, Vaughn spoke with Graves, Bade-Castro, and Gay about the new law and the intended new compensation structure;[5]

-on April 23, 2019, Dr. Puana sent Graves a draft of the proposed employment agreement, which provided for a flat, one-million-dollar salary ("4/23/19 Draft");[6] and

-on April 29, 2019, Dr. Puana sent him another draft of the agreement, which included a non-compete provision, and a non-solicitation provision ("4/29/19 Draft").[7]

---

[4] Dr. Puana states that, based on Vaughn's advice, she determined that she could not continue to pay Graves under his existing Employment Agreement, or she would expose herself, S&G, and its employees to criminal liability, and she informed Graves of her determination. [Puana Decl. at ¶ 17; id., Exh. B (email dated April 3, 2019 from Dr. Puana to Graves and others regarding upcoming conference call with Vaughn to discuss EKRA).]

[5] According to the Graves, during this conference call, there was no mention of material changes to other terms of the Employment Agreement, such as the non-compete provisions. [Graves Decl. at ¶¶ 8-9.]

[6] The 4/23/19 Draft provided that, in addition to the salary, Graves would be eligible for discretionary, quarterly bonuses. If S&G elected to pay a bonus, in determining the amount of the bonus, it would consider the factors listed in the employment agreement, which included: visits and contacts with existing accounts; the opening of new accounts; the loss of existing accounts; and various intra-office actions, like punctuality and attendance. [Graves Decl., Exh. B (email from Dr. Puana to Graves transmitting the 4/23/19 Draft) at 7.] Dr. Puana told Graves she was going to start paying him under the new compensation structure, even though the revised employment agreement had yet to be finalized. [CSOF at ¶ 14; Mem. in Opp. at 2.]

[7] The 4/29/19 Draft provided that, during Graves's employment and for one year thereafter, he would neither solicit
(. . . continued)

[CSOF at ¶¶ 6-7, 9-10; Mem. in Opp. at 2.]   The parties also agree that Graves was dissatisfied with the non-compete provision, and he and Dr. Puana engaged in good-faith contract negotiations through May 2019.   On May 15, 2019, Graves spoke with Dr. Puana about removing the non-compete provision from the draft, but she refused.   [CSOF at ¶¶ 11-12; Mem. in Opp. at 2.]

Graves was unhappy with the new compensation structure, and he argued EKRA did not apply to contracts such as his.   Dr. Puana believed Graves might decide to leave S&G rather than accept the new compensation structure.   Further, Graves had previously expressed a desire to acquire an ownership interest in S&G, but Dr. Puana had told him that was not possible because he was not a physician.   He also told her that, in the future, he wanted open his own laboratory business.   Dr. Puana therefore recognized that Graves could decide to leave S&G if they did not agree on a new contract, and she was prepared to offer him more money to convince him to stay.   However, under the circumstances, she wanted to add a non-compete clause to Graves's contract, and she did so for the entire sales team as well.   [Puana Decl. at ¶¶ 20-22.]

---

any of S&G's clients nor accept any of those clients as his own clients or as the clients of any company that he worked for or otherwise provided services for.   [Graves Decl., Exh. C (email from Dr. Puana to Graves transmitting the 4/29/19 Draft) at 4.]

Although she was unaware of it at the time, Dr. Puana later learned that Graves had urged Bade-Castro and Gay to join him in resisting the new employment agreements being proposed by S&G, and he told them that the three of them could move as a group to another medical laboratory. [Id. at ¶ 28.] After Bade-Castro signed her new employment agreement with S&G, she told Dr. Puana about the discussions she had with Graves about resisting the proposed contracts. [Id. at ¶ 30.]

According to Graves, Dr. Puana unilaterally imposed the new compensation structure and decreased Graves's pay, effective May 20, 2019. Graves Decl. at ¶¶ 16-17; see also id., Exh. E (emails dated May 15, 2019 between Dr. Puana and Graves) at 1 (12:27 p.m. email, in which Dr. Puana stated, "since I'm waiting on your signed contract I used a base figure for this pay period as the pay day on the 20th is for May 1-15 pay period.").

On May 21, 2019, Dr. Puana gave Graves a May 24, 2019 deadline to execute the proposed employment agreement, and she said she would "'uphold pay'" if he did not do so. [CSOF at ¶ 16; Mem. in Opp. at 2.] Graves informed Dr. Puana of his concerns about the proposed employment agreement and the negotiation process itself. On May 22, 2019, Dr. Puana told Graves: further discussions between them would be a waste of time; Graves's attorney should discuss the contract with Vaughn;

9

and Graves should thereafter make a quick decision on the proposed agreement.  [CSOF at ¶¶ 17-18; Mem. in Opp. at 2.]

Graves made multiple requests to meet with Dr. Puana in person to discuss the proposed employment agreement, but she refused.  On June 6, 2019, Dr. Puana, Vaughn, Graves, and his attorney participated in a conference call to discuss Graves's proposed agreement.  Dr. Puana insisted on a one-year non-compete provision, and she said Graves would be terminated if he did not agree to her terms.  [CSOF at ¶¶ 31-33; Mem. in Opp. at 2.]

C.   **Graves's Communications with an S&G Competitor**

In mid-May 2019, Graves contacted George Powell ("Powell"), who was a member of WHIC LLC, doing business as Aloha Toxicology ("Aloha Toxicology"),[8] and told Powell that he may not be working at S&G much longer.  Powell said that, if Graves left S&G, Aloha Toxicology might be open to hiring him as a sales representative.  Powell also said Daniel Hlavachek ("Hlavachek"), one of Aloha Toxicology's owners and members, would want to talk to Graves about it.  Graves asserts he did not disclose any confidential information to Powell, nor did he

---

[8] Aloha Toxicology "provid[es] laboratory services to various treatment and healthcare facilities in the state of Hawaii."  [CSOF, Decl. of Leighton M. Hara, Esq. ("Hara Decl."), Exh. K (Decl. of Dan Hlavachek, dated 8/6/19 ("Hlavachek Decl.")) at 3.]

make negative or derogatory statements about Dr. Puana, S&G or other S&G employees.  [Graves Decl. at ¶ 19.]

In early June 2019, Graves spoke to Hlavachek on the telephone.  Graves said he was in negotiations with S&G regarding a non-compete clause, but he did not disclose S&G's compensation structure, nor did he relay S&G's confidential/operational information.  Graves and Hlavachek discussed Graves's possible employment opportunities at Aloha Toxicology, including compensation, possible commission rates, future ownership options, and Aloha Toxicology's operations. [Id. at ¶ 20.]  Hlavachek and Graves discussed Aloha Toxicology's equipment, its certifications, and its lab manager. Hlavachek asked Graves how many specimens he could bring with him if he went to work for Aloha Toxicology, and Graves stated he could bring more than one thousand specimens per month. Hlavachek assured Graves that Aloha Toxicology could handle up to two thousand additional specimens per month.  Hlavachek did not make Graves an offer of employment during this call.  [Hara Decl., Exh. K (Hlavachek Decl.) at ¶¶ 9-11.]  Graves ultimately did not obtain employment with Aloha Toxicology.  See Graves Decl. at ¶ 31 ("Since November 21, 2019, I have been contracted with Pacific Toxicology Laboratories as an independent contractor.").

Hlavachek confirms Graves's statement that Graves did not disclose confidential information about S&G or its clients. See Hara Decl., Exh. K (Hlavachek Decl.) at ¶ 12.  Graves states:

> 21.   Other than what I described above, I have never discussed with a competitor of S&G, S&G's compensation or commission structure, equipment, internal systems or processes, business volume, or other information regarding S&G's internal operations.  Nor have I ever discussed any confidential information regarding S&G's clients with any potential competitor of S&G.
>
> 22.   At no time did I make any negative or derogatory comments about [Dr. Puana], S&G, or any S&G employee to any individual or entity outside of S&G.

[Graves Decl. at pg. 6.]

Bade-Castro moved to S&G with Graves from Precision Diagnostics in March 2017.  She states Graves told her about his on-going discussions with Aloha Toxicology, and he said he wanted her and Gay to stick with him and take all of their business to a new laboratory.  On more than one occasion, Graves invited her to participate in his telephone calls with someone from Aloha Toxicology, but she declined every time.  However, Graves would update her about the substance of those telephone calls afterward.  [Mem. in Opp., Decl. of Stefanie Bade-Castro

in lieu of Testimony under Direct Examination ("Bade-Castro

Decl.") at ¶¶ 2-4.[9]]   Bade-Castro states:

> 6.    Graves had described to me his earlier
> conversations with "George," and those included
> discussions of the relative technical
> capabilities of the two labs.  Graves told me he
> discussed with Aloha that they had more and
> better testing equipment than S&G Labs.  Graves
> told me that Aloha would be able to handle the
> larger number of samples for testing that would
> be necessary if we were to move and bring our
> accounts to Aloha for testing.
>
> 7.    Graves told me explicitly that he had
> discussed with "George" the "turn-around" time
> for S&G's test results, and the number and
> capacity of the "Liquid Chromatography Mass
> Spectrometer" machines used by S&G Labs to test
> the samples and the monthly volume.
>
> 8.    Graves told me that he discussed with
> George S&G's "in-network" contracts with
> insurance companies for testing services.
>
> 9.    Graves told me that Aloha Technology
> had agreed to match the 15% commission share in
> my S&G employment contract - the provision that
> was being eliminated by S&G Labs because of EKRA
> -- expressly stating that he told Aloha
> Technology that was my commission at S&G and that
> it would be necessary for them to match that
> figure.  He told me they agreed, subject to the
> "money" guy's approval.

[Id. at pgs. 3-4.]  Bade-Castro was concerned because: the

"specimen technicians" who worked at S&G had non-compete clauses

in their contracts and could not leave with the sales executives

---

[9] Although the title of the declaration suggests that it is
the same one which S&G submitted in support of its motion for a
preliminary injunction, it is dated December 28, 2020.  See
Bade-Castro Decl. at pg. 4.

if they went to Aloha Toxicology; and some specimen technicians
could be left without jobs if the sales executives took so much
business with them to Aloha Toxicology that S&G had to fire
technicians.  [Id. at ¶ 10.]  Graves told Bade-Castro that it
was his intent to take so much business from S&G that S&G would
have to fire laboratory employees.  That conversation "was the
last straw" for Bade-Castro and, on June 6, 2019, she told
Dr. Puana about Graves's attempts to take S&G clients with him
to Aloha Toxicology.  [Id.]

### D.   Graves's Suspension and Termination

On June 14, 2019, Dr. Puana suspended Graves with pay
and instructed him not to contact S&G clients.  [CSOF at ¶ 34;
Mem. in Opp. at 2.]  Dr. Puana suspended him because of his
continuing refusal to sign the proposed employment agreement and
because she was uncertain about the status of Graves's
discussions with Aloha Toxicology.  [Puana Decl. at ¶ 34.]

As of July 5, 2019, "S&G unilaterally reduced Graves'
salary by nearly 95% to $2,083 per pay period."  [CSOF at ¶ 37;
Mem. in Opp. at 2.]  On August 2, 2019, Graves sent an email to
Dr. Puana, arguing that suspending him and reducing his
compensation was unjustified and was a hardship on his family.
[CSOF at ¶ 38; Mem. in Opp. at 2.]

According to Graves, around the time of his
suspension, Dr. Puana and Bade-Castro began to arrange meetings

with his clients.  Some of Graves's clients told him that,
during these meetings, they were informed that Graves would no
longer be servicing their accounts and/or that S&G had let
Graves go.  Some of Graves's clients were confused and contacted
him to ask whether he was still with S&G.  [Graves Decl. at
¶ 26.]  Dr. Puana and Bade-Castro admit having these general
conversations with all S&G clients, beginning on June 16, 2019,
but both of them do not recall specific conversations.  The
subject of this pending action would come up during these
conversations, but Dr. Puana and Bade-Castro would not discuss
the details of the action with the S&G clients.  [Hara Decl.,
Exh. O (Dr. Puana's answers to interrogs., dated 8/10/20) at
pg. 6; id., Exh. P (Bade-Castro's answers to interrogs., dated
3/6/20) at pg. 5.]

On August 5, 2019, S&G's counsel informed Graves's
counsel that there was no basis for S&G to either continue to
pay Graves or return him to the position he held before the
suspension.  On September 9, 2019, S&G's counsel sent Graves's
counsel an email transmitting a letter terminating Graves's
employment for cause, effectively immediately ("Termination
Letter").  [CSOF at ¶¶ 39-40; Mem. in Opp. at 2.]  The
Termination Letter stated: "The 'for cause' justification is
based on several separate and disparate factual events which
constitute material breaches of specific provisions of the

employment agreement, each constituting 'cause' for termination. Among the factual bases for your termination are the following:" soliciting S&G employees to leave their employment, in violation of paragraph 7(d) of the Employment Agreement; disclosing confidential information, in violation of paragraph 6(d); engaging in other activity that could be expected to interfere with his duties at S&G, in violation of paragraph 3; engaging in conduct that exposed S&G to public disrespect, contempt, or ridicule, in violation of paragraph 10(b)(4); making disparaging statements about S&G and its leadership, in violation of paragraph 7(c); engaging in conduct that, if proven in court, would expose S&G to civil liability, in violation of paragraph 10(b); and engaging in conduct constituting moral turpitude, in violation of paragraph 10(b). [Hara Decl., Exh. I (email transmitting the Termination Letter) at 2-4.]

Graves emphasizes that the reasons cited in the Termination Letter were not investigated, nor were they discussed with him. Therefore, he had no opportunity to respond to the allegations. [CSOF at ¶ 41.] S&G asserts Dr. Puana investigated the conduct described in the Termination Letter, and she discussed the information that she learned with Vaughn and counsel who represents S&G in this case. [Hara Decl., Exh. N (S&G's answers to interrogs., dated 3/6/20) at pg. 19.]

According to Dr. Puana, during Graves's suspension, she learned that Graves:

-made "derogatory and sexually demeaning comments" about her; [Puana Decl. at ¶ 36;]

-engaged in inappropriate conversations with Bade-Castro and about their respective sex lives with their spouses;[10] [id. at ¶ 37;]

-engaged in sexually explicit conversations with S.B.K., an unmarried S&G employee, including offering to find her sexual partners if she would do the same for him; [id. at ¶ 38;]

-initiated the explicit conversions, which were of a "long-standing and broad nature"; [id. at ¶ 39;] and

-held himself out to some of his clients as a partner in S&G, [id. at ¶ 42].

Even prior to his suspension, Dr. Puana had to speak with Graves about the "abrasive and condescending" manner in which he interacted with laboratory staff, the majority of whom were women. [Id. at ¶ 36.]

Dr. Puana believed that, based on Bade-Castro's and S.B.K.'s statements, Graves could be found to have created a hostile work environment for female S&G employees. [Id. at ¶ 41.] Dr. Puana admits that she did not review these allegations with Graves during his suspension. [Id. at ¶ 43.] Dr. Puana ultimately issued the Termination Letter because,

---

[10] The Bade-Castro Declaration does not address the inappropriate conversations with Graves that Bade-Castro reported to Dr. Puana.

based on the totality of the circumstances and Graves's refusal
to execute the proposed employment agreement, "it was clear to
[her] he could not return to his prior position with S&G Labs."
[Id.]

The parties agree that: on August 30, 2019, S&G's
counsel conceded that Graves had not caused S&G to suffer any
harm or damages; S&G provides information about its operations,
including the average time S&G takes to analyze samples, to its
customers and its prospective customers; and S&G's website
includes pictures of, and information about, the testing
equipment that S&G uses.  [CSOF at ¶¶ 42, 44-45; Mem. in Opp. at
2.]

## II.  **Procedural Background**

### A.  **The Pleadings**

On June 13, 2019, prior to Graves's termination, S&G
filed its Complaint in this case.  [Dkt. no. 1.]  On August 19,
2019, Graves filed his answer to the Complaint, which included a
counterclaim and a third-party complaint against Dr. Puana and
Bade-Castro.  [Dkt. no. 35.]  He filed an amended counterclaim
on October 7, 2019.  [Dkt. no. 58.]  On March 1, 2020, S&G filed
a First Amended Complaint and its answer to the amended
counterclaim.  [Dkt. nos. 63, 64.]

The First Amended Complaint alleges: a claim under the
Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1832, 1836(b)(1)

18

("Count I"); a claim under the Hawai`i Uniform Trade Secrets Act ("HUTSA"), Haw. Rev. Stat. Chapter 482B ("Count II"); a breach of contract claim based on competition against S&G ("Count III"); a breach of contract claim based on solicitation of subordinates to move to S&G's competitor ("Count IV"); a breach of contract claim based on Graves's urging his subordinates to refuse to execute their new contracts ("Count V"); a breach of contract claim based on the creation of a sexually hostile work environment, thereby exposing S&G to civil liability ("Count VI"); a breach of contract claim based on disparagement of S&G's ownership and management in a vulgar and profane manner ("Count VII"); a breach of contract claim based on Graves's misrepresentations that he was one of S&G's owners/partners ("Count VIII"); and a claim for declaratory relief related to the alleged breaches of contract ("Count IX").

On May 6, 2020, Graves filed his answer to the First Amended Complaint, which included a Second Amended Counterclaim and a First Amended Third-Party Complaint. [Dkt. no. 72.]

B.   **The Instant Motion**

In the instant Motion, Graves seeks summary judgment in his favor as to all of the claims in S&G's First Amended Complaint. Graves's claims in the Second Amended Counterclaim and the First Amended Third-Party Complaint are not at issue in the Motion. Graves argues he is entitled to summary judgment as

to Count I and Count II because S&G cannot establish that he
misappropriated information which constitutes a trade secret
under the DTSA and the HUTSA.  As to S&G's breach of contract
claims,[11] Graves argues S&G cannot recover on those claims
because S&G failed to perform its obligations under his March 6,
2017 Employment Agreement.  Graves also contends that, unless
the employment contract provides otherwise, an employer's remedy
for an employee's poor performance under an employment contract
is to discipline or terminate him.

     In response to the Motion, S&G states that, because it
"lacks sufficient admissible and probative evidence that it has
suffered monetary damages as a result of Graves's conduct," it
intends to seek dismissal of Counts I and II prior to trial.
[Mem. in Opp. at 11.]  As to the breach of contract claims, S&G
argues the Puana Declaration and the Bade-Castro Declaration are
sufficient to raise genuine issues of material fact for trial.
S&G argues its reduction of Graves's pay was warranted because:
1) EKRA rendered the salary provisions of his March 6, 2017
Employment Agreement ineffective and invalid; and 2) Graves's
breaches of the agreement justified the reduction in his salary.
S&G argues this Court should reject Graves's argument regarding
an employer's inability to bring a breach of contract claim for

---

[11] Graves analyzes Count IX as another breach of contract
claim.  See, e.g., Mem. in Supp. of Motion at 20.

poor performance because S&G's claims are not based on poor performance.

**DISCUSSION**

## I.  **Trade Secret Claims**

S&G asks this Court to deny the portion of the Motion seeking summary judgment as to Counts I and II because S&G intends to dismiss those claims.  However, since filing its memorandum in opposition on December 28, 2020, S&G has taken no action to effectuate its stated intent to dismiss Counts I and II.  This Court will therefore address the merits of the Motion as to Counts I and II.

Under the DTSA: "An owner of a trade secret that is misappropriated may bring a civil action under this subsection if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1).

> [T]he term "trade secret" means all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if--
>
> > (A)  the owner thereof has taken reasonable measures to keep such information secret; and

> (B)  the information derives independent
> economic value, actual or potential, from
> not being generally known to, and not being
> readily ascertainable through proper means
> by, another person who can obtain economic
> value from the disclosure or use of the
> information[.]

18 U.S.C. § 1839(3); see also 18 U.S.C. § 1839(4), (5)

(definitions of "owner," and "misappropriation").  The HUTSA

definition of a "trade secret" is similar.  See Haw. Rev. Stat.

§ 482B-2 ("'Trade secret' means information, including a

formula, pattern, compilation, program device, method,

technique, or process that: (1) Derives independent economic

value, actual or potential, from not being generally known to,

and not being readily ascertainable by proper means by, other

persons who can obtain economic value from its disclosure or

use; and (2) Is the subject of efforts that are reasonable under

the circumstances to maintain its secrecy.").

This district court has noted that, for

misappropriation of trade secrets claims, "the analysis is

essentially the same under either" the DTSA or the HUTSA.  WHIC

LLC v. NextGen Labs., Inc., 341 F. Supp. 3d 1147, 1161 (D.

Hawai`i 2018) (citing Veronica Foods Co. v. Ecklin, 2017 WL

2806706, at *13 (N.D. Cal. June 29, 2017)).  Further, "Hawaii

law defines 'misappropriation' nearly identically as does 18

U.S.C. § 1839(5)."  Id. (quoting Haw. Rev. Stat. § 482B-2).

Thus, "[t]o prevail on a HUTSA claim, a plaintiff must establish

that there exists a trade secret and a misappropriation of that

trade secret," and the same elements are required to prove a

DTSA claim.  Id. at 1162 & n.25.  This district court has also

stated:

> "[A] plaintiff who seeks relief for
> misappropriation of trade secrets must identify
> the trade secrets and carry the burden of showing
> that they exist." MAI Sys. Corp. v. Peak
> Computer, Inc., 991 F.2d 511, 522 (9th Cir.
> 1993).[12]  The plaintiff "should describe the
> subject matter of the trade secret with
> sufficient particularity to separate it from
> matters of general knowledge in the trade or of
> special knowledge of those persons . . . skilled
> in the trade." Imax Corp. v. Cinema Techs.,
> Inc., 152 F.3d 1161, 1164-65 (9th Cir. 1998)
> (citing Univ. Analytics v. MacNeal-Schwendler
> Corp., 707 F. Supp. 1170, 1177 (C.D. Cal. 1989)).

Admor HVAC Prods., Inc. v. Lessary, No. CV 19-00068 SOM-KJM,

2019 WL 2518105, at *9 (D. Hawai`i June 18, 2019) (some

alterations in Admor HVAC).

According to Graves, he did not disclose S&G's

compensation structure, nor did he relay S&G's

confidential/operational information during his discussions with

Aloha Toxicology about possible employment opportunities.

[Graves Decl. at ¶¶ 20-21.]  Graves also presents Hlavachek's

testimony confirming that Graves did not disclose confidential

information about S&G or its clients.  See Hara Decl., Exh. K

---

12 MAI Systems was overruled on other grounds by eBay, Inc.
v. MercExchange, LLC, 547 U.S. 388 (2006).

(Hlavachek Decl.) at ¶ 12.  S&G also concedes that: as of August 30, 2019, Graves had not caused S&G to suffer any harm or damages; and some of the information it alleges Graves disclosed to Aloha Toxicology is either disclosed to S&G's customers or is publicly available on S&G's website; [CSOF at ¶¶ 42, 44-45; Mem. in Opp. at 2.]  Graves has therefore carried his initial burden of production on the Motion by "showing that [S&G] does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."  See Friedman v. Live Nation Merch., Inc., 833 F.3d 1180, 1188 (9th Cir. 2016) (quotation marks, citation, and some brackets omitted).

Because Graves has carried his burden of production, S&G "must produce evidence to support its claim[s] . . . ."  See id. (citation and quotation marks omitted).  S&G presents Bade-Castro's testimony that Graves told her he disclosed to Aloha Toxicology: how fast S&G generated test results; S&G's testing equipment; S&G's monthly testing volume; and the fact that S&G was paying Bade-Castro fifteen percent commission.  [Bade-Castro Decl. at ¶¶ 7, 9.]  Bade-Castro also stated Graves "discussed with [someone from Aloha Toxicology] S&G's 'in-network' contracts with insurance companies for testing services."  [Id. at ¶ 8.]  Bade-Castro's testimony is the only evidence S&G has presented to identify the trade secrets at issue in their DTSA and HUTSA claims.  See MAI Sys., 991 F.2d at 522.

24

In considering Graves's Motion, the record must be viewed in the light most favorable to S&G, the nonmoving party. See Crowley v. Bannister, 734 F.3d 967, 976 (9th Cir. 2013). Further, this Court cannot make credibility determinations on summary judgment.  See Estate of Lopez ex rel. Lopez v. Gelhaus, 871 F.3d 998, 1009 n.10 (9th Cir. 2017) ("At the summary judgment stage, '[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" (alteration in Lopez) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986))).  Therefore, for purposes of the instant Motion, Bade-Castro's testimony regarding Graves's reports of his discussions with Aloha Toxicology will be accepted.

Neither the information that Graves presumably disclosed to Aloha Toxicology about the speed at which S&G returns test results nor the information that he presumably disclosed about what testing equipment S&G uses constitutes a "trade secret" because S&G did not take reasonable actions to maintain the secrecy of the information.  S&G has admitted that: it provides information about its operations, including the average time S&G takes to analyze samples, to its customers and its prospective customers; and S&G's website includes pictures of, and information about, the testing equipment that S&G uses.

[CSOF at ¶¶ 44-45; Mem. in Opp. at 2.]  It is not clear from the current record whether S&G's monthly testing volume is among the operational information which S&G admits it provides to its customers and prospective customers.  Thus, there is a genuine issue of fact as to whether S&G took reasonable steps to maintain the secrecy of its monthly testing volume.

According to Bade-Castro, Graves and Aloha Toxicology "discussed" S&G's contracts to provide testing services for insurance companies.  [Bade-Castro Decl. at ¶ 8.]  Although it is not clear what specifically was discussed about S&G's contracts with insurance companies, viewing the record in the light most favorable to S&G, there is an issue of fact as to whether the information that Graves presumably disclosed to Aloha Toxicology was information which S&G took reasonable steps to keep secret.  See Graves Decl., Exh. A (Employment Agreement) at ¶ 6(a) (including "any customer lists and customers, contracts with and information relating to customers, medical insurers and claim administrators" within the definition of "Confidential Information").  Viewing the record in the light most favorable to S&G, its commission compensation structure for its sales team was information that S&G took reasonable steps to keep secret.  See id. (including "financial statements and projections, . . . pricing policies, operational methods, methods of doing business, . . . business plans and projects

pertaining to the Company" within the definition of
"Confidential Information").  Graves himself denies discussing
S&G's compensation system with Aloha Toxicology, which indicates
that he was aware doing so was prohibited.  See Graves Decl. at
¶ 21 ("I have never discussed with a competitor of S&G, S&G's
compensation or commission structure").

However, S&G has presented no evidence which raises a
genuine issue of fact as to the question of whether either its
monthly testing volume, testing contracts with insurance
companies, or compensation structure is information that has
actual or potential economic value because it is not generally
known.  Further, in light of S&G's representation that it lacks
sufficient admissible and probative evidence of damages
associated with its trade secrets claims, this Court finds that
there are no genuine issues of material fact as whether S&G's
testing volume, insurance company contracts, and commission
structure was information that had economic value.  S&G cannot
carry its burden of proof at trial as to an essential element of
its DTSA claim and its HUTSA claim – that a trade secret exists.
Because there is no genuine issue of material fact for trial,
Graves is entitled to judgment as a matter of law as to Count I
and Count II.  See Fed. R. Civ. P. 56(a) ("The court shall grant
summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law.").

## II.   **Breach of Contract Claims**

This Court has stated:

> Under Hawai`i law, the elements of a breach of contract claim are (1) the contract at issue; (2) the parties to the contract; (3) whether plaintiff performed under the contract; (4) the particular provision of the contract allegedly violated by defendants; and (5) when and how defendants allegedly breached the contract.

RSMCFH, LLC v. FareHarbor Holdings, Inc., 361 F. Supp. 3d 981, 991 (D. Hawai`i 2019) (brackets, citations, and internal quotation marks omitted).  The first two requirements are not in dispute because it is clear that the contract at issue is the March 6, 2017 Employment Agreement between S&G and Graves.

### A.   **Alleged Breaches by S&G**

Graves argues all of S&G's breach of contract claims fail because S&G itself breached the Employment Agreement by unilaterally changing his compensation while the negotiations regarding the new contract were ongoing.  The Employment Agreement states:

> This Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision hereof shall be prohibited or invalid under any such law, such provision shall be inenect1ve to the extent of such prohibition or invalidity, without invalidating or nullifying the remainder of such provision or any other provisions of this Agreement.  If any one or more of the provisions

28

> contained in this Agreement shall for any reason
> be held to be excessively broad as to duration,
> geographical scope, activity or subject, such
> provisions shall be construed by limiting and
> reducing it so as to be enforceable to the
> maximum extent permitted by applicable law.

[Graves Decl., Exh. A (Employment Agreement) at ¶ 11.] S&G's position is that EKRA rendered the compensation provisions of Graves's Employment Agreement unenforceable, and therefore S&G's unilateral departure from that compensation system was not a breach of the Employment Agreement.

S&G presents Dr. Puana's testimony that, based on Vaughn's advice regarding the effect of EKRA, she determined that, if she continued to pay Graves under the provisions of the Employment Agreement, she would expose herself, S&G, and its employees to criminal liability. [Puana Decl. at ¶ 17.] According to Dr. Puana, Graves believed EKRA did not apply to his contract. [Id. at ¶ 20.] Neither S&G nor Graves has presented expert testimony regarding the scope and effect of EKRA. Therefore, viewing the record in the light most favorable to S&G, there is a genuine issue of fact as to the issue of whether S&G was justified in reducing Graves's compensation.

Graves also alleges S&G breached the Employment Agreement because: Dr. Puana informed him on June 6, 2019 that his employment would be terminated if he did not sign a new contract; see CSOF at ¶ 33; Mem. in Opp. at 2; S&G ultimately

terminated his employment; see Hara Decl., Exh. I at 2-4 (Termination Letter); and S&G has failed to make the severance payment required under the Employment Agreement, see Graves Decl., Exh. A (Employment Agreement) at ¶ 10(c) (describing the severance package that Graves would be entitled to if S&G terminated his employment without cause). At a minimum, there is a genuine issue of fact as to the question of whether EKRA invalidated the compensation provisions of Graves's Employment Agreement and required S&G and Graves to enter into a new agreement. There is also a genuine issue of fact as to whether Graves's refusal to enter into a new agreement constituted grounds for S&G to terminate him for cause. See Graves Decl., Exh. A at ¶ 10(b) (provision governing termination by S&G for cause, which not contain a requirement to provide a severance package).

For purposes of the instant Motion, Graves has failed to carry his burden of production and persuasion as to his argument that S&G breached his Employment Agreement. Graves's Motion is therefore denied to the extent that he seeks summary judgment in his favor as to all of S&G's breach of contract claims on the ground that S&G's own breach of the contract precludes S&G from recovering on the breach of contract claims

in the First Amended Complaint.[13]   The Court now turns to the merits of each of S&G's breach of contract claims.

###    B.   Alleged Competition against S&G

Count III alleges Graves breached paragraphs 6(a) and 7(a) of the Employment Agreement by assisting a person or entity who is in competition with S&G.  [First Amended Complaint at ¶¶ 39-43.]  Paragraph 6(a) of the Employment Agreement prohibited Graves from disclosing "'Confidential Information,'" which included trade secrets.  [Graves Decl., Exh. A at ¶ 6(a).] The portion of Count III based on Graves's alleged breach of paragraph 6(a) fails, as a matter of law, for the same reasons that S&G's Counts I and II fail.  Graves is entitled to summary judgment as to that portion of Count III.

The Employment Agreement prohibited Graves from assisting a person or entity who was a competitor of S&G.  [Id. at ¶ 7(a).]  Aloha Toxicology is competitor of S&G, and Hlavachek is a member and owner of Aloha Toxicology.  See Hara Decl., Exh. K (Hlavachek Decl.) at ¶¶ 2-3.  Graves carried his burden of proof by presenting evidence that he did not assist Hlavachek and Aloha Toxicology in competition with S&G.  See, e.g., id. at ¶ 12 (stating Graves did not disclose confidential

---

[13] These rulings do not preclude Graves from presenting additional evidence at the trial regarding the issue of whether S&G breached the Employment Agreement, for purposes of his counterclaims and third-party claims.

information about S&G to him).  Even viewing the entire summary
judgment record, including Bade-Castro's testimony, in the light
most favorable to S&G, there is no evidence suggesting that
anything which Graves presumably disclosed to S&G assisted
either Aloha Toxicology or any person associated with Aloha
Toxicology to compete against S&G.  See Bade-Castro Decl. at
¶¶ 6-9 (describing what Graves told her about his discussions
with Aloha Toxicology); see also CSOF at ¶ 42 (stating that, on
August 30, 2019, S&G's counsel admitted that Graves had not
caused S&G to suffer any harm or damages); Mem. in Opp. at 2
(stating Graves's paragraph 42 is not disputed).  There is no
genuine issue of material fact as to S&G's allegation that
Graves violated paragraph 7(a) of his Employment Agreement, and
Graves is entitled to judgment as a matter of law as to that
portion of Count III.

        Graves's Motion is granted insofar as summary judgment
is granted in his favor as to Count III.

### C.  Alleged Interference with Bade-Castro's and Gay's Negotiations with S&G

        Count IV alleges Graves breached paragraph 7(d) of the
Employment Agreement by soliciting his subordinates to leave S&G
and work for one of its competitors.  [First Amended Complaint
at ¶¶ 44-51.]  Count V alleges Graves breached paragraph 3 of
the Employment Agreement by urging his subordinates to refuse to

execute their new contracts.  [Id. at ¶¶ 52-61.]  Viewing the record in the light most favorable to S&G, this Court accepts: Bade-Castro's testimony that Graves solicited her and Gay to consider leaving S&G to work for Aloha Toxicology; and her testimony that he urged them not to sign the new contracts which S&G offered them.  See, e.g., Bade-Castro Decl. at ¶ 2.  There is no evidence in the record suggesting that Graves made similar propositions to any other S&G employee.

Graves's Employment Agreement states, in pertinent part:

> 3.   Best Efforts.  The Employee shall use the Employee's best efforts to promote the interests of the Company in connection with the Company's Business, and Employee shall devote appropriate business time and efforts to the Company's Business as necessary to perform effectively the Employee's duties, services and responsibilities hereunder.  The Employee shall not engage in any other activity, which could reasonably be expected to interfere with the performance of the Employee's duties, services and responsibilities hereunder.
>
> . . . .
>
> 7.   Restrictive Covenants
>
> . . . .
>
> (d)  Employee shall not, either during the term of this Agreement or within 2 years after termination, solicit any Company employees to leave the Company's employment, other than [six individuals who are not relevant to this case].

[Graves Decl., Exh. A at pgs. 1-3 (emphases and annotation omitted).]

Although Graves attempted to convince both Bade-Castro and Gay to leave S&G with him, neither of them actually left S&G.  See Puana Decl. at ¶ 29 (stating that, on June 6, 2019, Bade-Castro agreed to the new contract S&G was offering her); Hara Decl., Exh. M (excerpt of Decl. of Justin Gay, signed August 15, 2019 ("Gay Decl.")) at pg. 1 (stating Gay is an Account Representative with S&G).[14]  There is no evidence in the record suggesting that either Graves's discussions with Bade-Castro and Gay about potential employment with Aloha Toxicology or Graves's discussions with Aloha Toxicology impaired his work performance.  It was S&G that instructed Graves to stop contacting S&G clients.  See Graves Decl. at ¶ 25.  Further, there is no evidence suggesting that Graves's discussions with Bade-Castro and Gay about other employment impaired Bade-Castro's and Gay's work at S&G.  However, paragraph 3 prohibits any conduct that "could **reasonably be expected** to interfere" with the employee's performance.  [Graves Decl., Exh. A (Employment Agreement) at pg. 1 (emphasis added).]  Viewing the record in the light most favorable to S&G, by attempting to convince Bade-Castro and Gay not to sign the new contracts that

_____

[14] The complete version of the Gay Declaration was originally filed on August 15, 2019 by S&G.  [Dkt. no. 34-3.]

S&G was proposing and to accept employment elsewhere, Graves engaged in conduct that "could reasonably be expected to interfere" with his work performance and theirs.

However, because it is undisputed that Graves's attempts to convince Bade-Castro and Gay to leave S&G were unsuccessful, S&G did not suffer any damages as a result of the attempted solicitation.  This district court has recognized that, "[t]o prevail on a breach of contract claim, a plaintiff must establish damages."  Breast Care Ctr. of Hawai`i LLC v. Fujifilm Med. Sys. U.S.A., Inc., CIVIL NO. 17-443 JAO-WRP, 2019 WL 2146244, at *7 (D. Hawai`i May 16, 2019) (citing Chuck Jones and MacLaren v. Williams, 101 Haw. 486, 500 (Ct. App. 2003); Choy v. Cont'l Cas. Co., No. CV 15-00281 SOM/KSC, 2015 WL 7588233, at *4 (D. Haw. Nov. 25, 2015)), reconsideration denied, 2019 WL 3231739 (July 18, 2019).  Because S&G cannot establish that it suffered any damages as a result of Graves's attempts to solicit Bade-Castro and Gay to leave S&G, Count IV fails as a matter of law.

Similarly, there is no evidence in the record suggesting that there is a genuine issue of fact as to the question of whether Graves's, Bade-Castro's, or Gay's work performance suffered as a result of Graves's attempts to convince them not to sign their new S&G contracts.  Because S&G cannot establish any damages, Count V fails as a matter of law.

Graves's Motion is therefore granted as to Counts IV and V.

### D.   **Alleged Violations of Paragraph 10(b)**

Graves's Employment Agreement states:

> (b)  Termination by Company with Cause.  The Company shall have the right to terminate Employee's employment with the Company under this Agreement at any time For Cause, which termination shall be effective immediately upon written notice to Employee.  Termination "For Cause" shall allow termination for any of the following reasons: 1) conviction of a felony offense; 2) a reasonable determination by two qualified medical professionals that Employee is mentally unstable or otherwise unable to perform the duties of this job; 3) a breach by Employee of a material obligation under this Agreement; 4) or conduct that: (a) constitutes moral turpitude, (b) brings public disrespect, contempt, or ridicule upon the Company, or (c) if proven in a court of law, would constitute grounds for criminal conviction of Employee or civil liability of the Company. . . .

[Graves Decl., Exh. A at ¶ 10(b) (emphasis omitted).]  Count VI alleges Graves breached paragraph 10(b) by engaging in conduct that, if proven, would constitute a sexually hostile work environment, thereby exposing S&G to civil liability.  [First Amended Complaint at ¶¶ 62-73.]  Count VIII alleges he breached paragraph 10(b) by misrepresenting himself as one of S&G's owners/partners.  [Id. at ¶¶ 79-85.]

As to Count VI, S&G presents Dr. Puana's testimony that she "learned that [Graves] engaged in sexually inappropriate conversations with at least two female employees –

36

SBK and Bade-Castro." Puana Decl. at ¶ 37; see also id. at ¶¶ 37-39 (describing the conversations). As to Count VIII, S&G presents Dr. Puana's testimony that she

> learned during [Graves's] suspension that some S&G Labs' "clients" were of the mistaken belief that Mr. Graves was the owner or co-owner of S&G Labs. [She] learned from Bade-Castro that Graves would sometimes describe himself to "clients" as a "partner" in S&G Labs. In one instance, when he was removed from his sales position, and another account representative made contact in his place, one "client" asked how could the owner of a business be suspended from his sales position?

[Puana Decl. at ¶ 42.]

Except for the one conversation with an unidentified client who asked about Graves's suspension, there is no indication that Dr. Puana participated in or witnessed any of these conversations. S&G has not offered the testimony of any of the participants to those conversations. As to the one conversation Dr. Puana was a participant in, S&G does not offer the testimony of the client who asked the question. Arguably, Dr. Puana's descriptions of these conversations should not be considered because they are hearsay and S&G has not identified any exception to the hearsay rule. See Weil v. Citizens Telecom Servs. Co., 922 F.3d 993, 998 (9th Cir. 2019) (noting "we may only consider admissible evidence when reviewing a motion for summary judgment" (citation omitted)); Gallagher v. MaternityWise Int'l, LLC, CIV. NO. 18-00364 LEK-KJM, 2021 WL

276975, at *13 (D. Hawai`i Jan. 27, 2021) ("Hearsay is an out-of-court statement offered for the truth of the matter asserted. Fed. R. Evid. 801(c). 'In the absence of a procedural rule or statute, hearsay is inadmissible unless it is defined as non-hearsay under Federal Rule of Evidence 801(d) or falls within a hearsay exception under Rules 803, 804 or 807.'" (quoting Orr v. Bank of Am., NT & SA, 285 F.3d 764, 778 (9th Cir. 2002))).[15]  It is not necessary to engage in a detailed hearsay analysis in ruling on Graves's Motion because, even if all of Dr. Puana's statements are considered, they are not sufficient to create a genuine issue of material fact as to either Count VI or Count VIII.

First, paragraph 10(b) of the Employment Agreement expressly stated that, if Graves engaged in any of the identified conduct, S&G had the right to terminate his employment for cause. [Graves Decl., Exh. A at pg. 4.] S&G fails to identify a breach of any other provision of the Employment Agreement as a result of the conduct raised in Counts VI and VIII.[16]  See RSMCFH, 361 F. Supp. 3d at 991

---

[15] Orr was superseded on other grounds by the 2010 amendments to Fed. R. Civ. P. 56.  See, e.g., Dinkins v. Schinzel, 362 F. Supp. 3d 916, 922-23 (D. Nev. 2019).

[16] Paragraph 10(b)(3) refers to the breach "of a material obligation under this Agreement," [Graves Decl., Exh. A at 4,] which necessarily requires the breach of another provision of
                                        (. . . continued)

(stating the identification of the specific contractual provision breached is an essential element of a breach of contract claim).  Thus, S&G's sole remedy for the conduct at issue in Counts VI and VIII is the remedy provided in paragraph 10(b), termination of his employment for cause.[17]

Even assuming that S&G can pursue breach of contract claims for the conduct described in paragraph 10(b)(4) of the Employment Agreement, Counts VI and VIII would fail because Plaintiff has not suffered any damages as a result of the conduct at issue in those claims.  As to Count VI, even assuming that Graves made all of the inappropriate sexual comments which Dr. Puana describes, Graves was suspended beginning June 14,

_____

the Employment Agreement.  However, it is paragraph 10(b)(4)(c) that is at issue in Count VI and paragraph 10(b)(4)(b) that is at issue in Count VIII.

[17] In light of this ruling, and the other rulings on S&G's breach of contract claims, this Court declines to address Graves's argument that, "[a]s a general rule, employers 'do not have a cause of action for damages against an employee who breaches his or her contractual obligation to provide competent, satisfactory services.'"  [Mem. in Supp. of Motion at 22-23 (some citations omitted) (quoting Restatement of Employment Law § 9.07 (comment b)).]  The Court notes that Graves has not cited any case law establishing that the Hawai`i Supreme Court has adopted this particular section of the Restatement, nor has he cited any other legal authority indicating that the supreme court is likely to do so.  See Trishan Air, Inc. v. Fed. Ins. Co., 635 F.3d 422, 427 (9th Cir. 2011) ("In the absence of . . . a decision [by the state's highest court], a federal court must predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance." (citation and quotation marks omitted)).

39

2019, and Dr. Puana learned about the inappropriate conversations during his suspension.  [Puana Decl. at ¶¶ 34, 37.]  Thus, the hostile work environment Graves presumably created existed prior to June 14, 2019.  In spite of that fact, S&G has not presented any evidence that either Bade-Castro, S.B.K., or any other S&G employee made any type of discrimination claim against S&G based upon Graves's inappropriate sexual comments.  Therefore, there are no genuine issues of fact as to Count VI, and S&G has not actually been exposed to civil liability because of Graves's comments.  Because S&G has not suffered any damages as a result of the inappropriate sexual comments that this Court presumes, for purposes of this Motion, Graves made, Count VI fails as a matter of law.

As to Count VIII, even accepting S&G's evidence that Graves misrepresented himself as an owner of, or partner in, S&G, there is no evidence in the record which raises a genuine issue of fact as to the question of whether those representations brought "public disrespect, contempt, or ridicule upon" S&G.  See Graves Decl., Exh. A (Employment Agreement) at ¶ 10(b)(4)(b).  Because S&G has failed to identify evidence which raises a genuine issue of material fact as to the alleged effects of Graves's misrepresentation, Graves is entitled to judgment as a matter of law as to Count VIII.

Graves's Motion is therefore granted as to Counts VI and VIII.

### E.    **Alleged Disparaging Statements About Dr. Puana**

Count VII alleges Graves breached paragraph 7(c) of his Employment Agreement by making statements that disparaged of S&G's ownership and management, *i.e.* Dr. Puana, in a vulgar and profane manner.  [First Amended Complaint at ¶¶ 74-78.]  Graves acknowledges there is evidence that he "sometimes made vulgar and personally derogatory comments about" Dr. Puana.  See Hara Decl., Exh. M (excerpts of Gay Decl.) at pg. 11.  Dr. Puana states that, "[w]hile Graves was suspended, [she] began to learn more about Graves'·actions and conversations with S&G Labs'·employees, including derogatory and sexually demeaning comments made by him about [her] personally."  [Puana Decl. at ¶ 36.]  Graves denies "mak[ing] any negative or derogatory comments about [Dr. Puana], S&G, or any S&G employee to any individual or entity outside of S&G."  [Graves Decl. at ¶ 22.]  In other words, Graves does not deny making negative or derogatory comments **within** S&G.

Paragraph 7(c) of Graves's Employment Agreement, quoted *supra*, prohibited from making disparaging statements about Dr. Puana.  [Graves Decl., Exh. A at pg. 3.]  Viewing the record in the light most favorable to S&G, there is, at a minimum, a genuine issue of fact as to the question of whether

Graves breached paragraph 7(c).  However, S&G has conceded that,
as of August 30, 2019, Graves had not caused S&G to suffer any
harm or damages.  See CSOF at ¶ 42; Mem. in Opp. at 2.  S&G has
not presented any evidence which raises a genuine issue of fact
as to the question of whether Graves's derogatory or negative
comments about Dr. Puana caused S&G to suffer harm or damages
after August 30, 2019.  Therefore, there are no genuine issues
of fact, and S&G cannot establish that it suffered damages
because of the breach of contract alleged in Count VII, and that
claim fails as a matter of law.

      **F.**  **Claim for Declaratory Relief**

      Finally, Count IX seeks a declaratory judgment that
Graves committed material breaches of his Employment Agreement,
and therefore S&G is not required perform its obligations under
that contract.  [First Amended Complaint at ¶¶ 86-88.]  Count IX
does not allege any breaches of contract other than what is
alleged in Counts III through VIII.  Instead, Count IX merely
seeks a remedy for those alleged breaches of contract claims,
and Count IX is not an independent cause of action.  See, e.g.,
Tran v. Dep't of Planning for Cnty. of Maui, CIVIL NO. 19-00654
JAO-RT, 2020 WL 3146584, at *7 n.4 (D. Hawai`i June 12, 2020)
(noting a purported claim for declaratory relief, that was
brought pursuant to 28 U.S.C. § 2201, was "a remedy, not a
standalone cause of action" (citing County of Santa Clara v.

<u>Trump</u>, 267 F. Supp. 3d 1201, 1215–16 (N.D. Cal. 2017))).

Because summary judgment has been granted in favor of Graves as to Counts III through VIII, he is also entitled to summary judgment as to Count XI.[18]

<u>**CONCLUSION**</u>

For the foregoing reasons, Graves's Motion for Summary Judgment, filed November 4, 2020, is HEREBY GRANTED, insofar as summary judgment is granted in favor of Graves as to all of the claims in S&G's First Amended Complaint, filed March 1, 2020. The only claims remaining at issue in this case are Graves's claims in his Second Amended Counterclaim and his First Amended Third-Party Complaint, both filed on May 6, 2020.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, February 17, 2021.



/s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

**S&G LABS HAWAII, LLC VS. DARREN GRAVES; CV 19-00310 LEK-WRP; ORRDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

[18] Although summary judgment has been granted in favor of Graves as to all of S&G's breach of contract claims, S&G is not precluded from raising the facts at issue in those claims in support of its defense against Graves's counterclaims, nor are Dr. Puana and Bade-Castro precluded from raising those facts in support of their defenses against Graves's third-party claims.