UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

| | |
|---|---|
| S&G LABS HAWAII, LLC, A HAWAII LIMITED LIABILITY COMPANY, | **CIV. NO. 19-00310 LEK-WRP** |
| Plaintiff, | |
| vs. | |
| DARREN GRAVES, | |
| Defendant. | |

**ORDER: RULING ON THE PARTIES' PRETRIAL BRIEFS;
AND GRANTING IN PART AND DENYING IN PART
THE S&G PARTIES' MOTION FOR SUMMARY JUDGMENT**

On April 9, 2021, for reasons unrelated to this case, the Court vacated the trial and discharged the jury that was selected on April 5, 2021.  The Court also issued two briefing schedules for the parties to address issues of law to be resolved prior to the new trial date.  [Minutes - EP: Trial Status Conference, filed 4/9/21 (dkt. no. 185).]  The instant Order rules on the issues presented in: 1) Defendant/Counter Claimant/Third-Party Plaintiff Darren Graves's ("Graves") Opening Brief Regarding Counts I and II, Attorneys' Fees Under DTSA and HUTSDA ("Trade Secrets Brief"); [filed 4/23/21 (dkt. no. 188);] 2) Graves's Opening Brief Regarding Liability Under Count X and XI, Wrongful Termination ("Wrongful Termination Brief"); [filed 5/28/21 (dkt. no. 197);] 3) Graves's Opening

Brief Re Inadmissibility of Interpretation or Application of Law ("EKRA Brief");[1] [filed 5/28/21 (dkt. no. 198);] and 4) the Motion for Summary Judgment as to Counts Three, Six, and Seven, of the Second Amended Counterclaim, and Counts One Through Four of the First Amended Third Party Complaint filed by Plaintiff/Counterclaim Defendant S&G Labs Hawaii, LLC ("S&G") and Third-Party Defendants Lynn Puana ("Dr. Puana") and Stephanie Bade-Castro ("Bade-Castro" or "Castro" and, collectively with S&G and Dr. Puana, "S&G Parties", and "S&G Parties' Motion"), [filed 5/28/21 (dkt. no. 199)].  A hearing on the issues presented in the Trade Secrets Brief was held on June 4, 2021, and a hearing on the issues presented in the Wrongful Termination Brief, the EKRA Brief, and the S&G Parties' Motion was held on July 16, 2021.

For the reasons set forth below, the Court rules as follows:

1)   Graves is entitled to an award of the reasonable attorneys' fees that he incurred defending against S&G's trade secret claims after December 28, 2020.

2)   The commission-based compensation provisions of Graves's employment contract with S&G did not violate EKRA, and therefore S&G's failure to pay him according to those provisions

---

[1] "EKRA" refers to the Eliminating Kickbacks in Recovery Act, which was part of the Substance Use - Disorder Prevention that Promotes Opioid Recovery and Treatment for Patients and Communities Act of 2018.  The EKRA is Subtitle J of Title VIII of the larger act, Pub. L. 115-271, 132 Stat. 3894, 3900, 4108-10 (2018), and it is codified at 18 U.S.C. § 220.

constituted both a breach of contract and a violation of Haw.
Rev. Stat. Chapter 388.

3)   Graves has established his prima facie case for his
wrongful termination claim under the Hawai`i Whistleblower
Protection Act, Haw. Rev. Stat. § 378-61, et seq. ("HWPA"), and
he has established his prima facie case for his claim alleging a
wrongful termination in violation of public policy.  Only issues
related to S&G's defenses to these claims and Graves's damages
associated with these claims will be presented to the jury.

4)   Summary judgment is granted in favor of Bade-Castro as to
Graves's third-party claim based upon her allegedly defamatory
statements about him to Dr. Puana.

5)   The S&G Parties' request for summary judgment is denied as
to Graves's defamation per se claim and his
defamation/commercial disparagement claim against Dr. Puana.

## BACKGROUND

        The parties and the Court are familiar with the

factual and procedural background of this case, which will only

briefly be summarized here.  The facts that are relevant to only

one specific brief or only to the S&G Parties' Motion will be

included within those portions of the Discussion section.

        Graves was employed by S&G as a manager overseeing

client accounts.  He began his employment on March 6, 2017, and

the term of his Employment Agreement was scheduled to end on

March 6, 2023.  [Graves's concise statement of facts in supp. of

Motion for Summary Judgment ("Graves CSOF"), filed 1/4/20 (dkt.

no. 96), at ¶¶ 3-4; S&G's mem. in opp. to Graves's summary

judgment motion ("S&G's Summary Judgment Opp."), filed 12/28/20

(dkt. no. 102), at 2 (admitting Graves CSOF ¶¶ 3-4); Graves's

CSOF, Decl. of Darren Graves ("Graves 11/4/20 Decl."), Exh. A (Employment Agreement).] His compensation included a base annual salary of $50,000 and percentages of the monthly net profits generated by his client accounts and by the client accounts handled by the S&G employees who he managed. [Graves 11/4/20 Decl., Exh. A at 1, 7.]

In early 2019, S&G's General Counsel advised Dr. Puana that: EKRA prevented a medical testing company from compensating its employees based on the number of tests the company performed; and if she continued to pay the S&G sales team according to their existing employment agreements, she could face criminal penalties. [S&G's Summary Judgment Opp., Decl. of Lynn Puana, M.D. ("Puana 12/28/20 Decl.") at ¶¶ 14-15.] Dr. Puana subsequently informed the S&G account executives - including Graves, Bade-Castro, and Justin Gay ("Gay") - about EKRA and her intent to revise their compensation structure. During the revision process, Dr. Puana proposed a salary-based compensation structure and included a non-compete provision and a non-solicitation provision. [Graves's CSOF at ¶¶ 6-7, 9-10; S&G's Summary Judgment Opp. at 2 (admitting Graves's CSOF ¶¶ 6-7, 9-10).] In the following weeks, Graves and Dr. Puana engaged in negotiations regarding her proposals for his new employment agreement, but they never entered into a new agreement. On June 14, 2019, Dr. Puana suspended Graves with pay and

instructed him not to contact S&G clients.  [Graves's CSOF at ¶ 34; S&G's Mem. in Opp. at 2 (admitting Graves's CSOF ¶ 34).] On September 9, 2019, S&G issued a letter terminating Graves's employment for cause ("Termination Letter").  See generally evidence cited in the Order Granting Defendant's Motion for Summary Judgment, filed 2/17/21 (dkt. no. 121) ("2/17/21 Order"), at 8-15.[2]

        While the negotiations about the new employment contracts were ongoing, Graves contacted an S&G competitor, WHIC LLC, doing business as Aloha Toxicology ("Aloha Toxicology"), about the possibility of employment with that entity.  Graves engaged in a number of discussions with George Powell, a member of Aloha Toxicology, and Daniel Hlavachek, an owner and member of Aloha Toxicology, but Graves ultimately did not become employed with Aloha Toxicology.  [Graves 11/4/20 Decl. at ¶¶ 19-20, 31; Graves CSOF, Decl. of Leighton M. Hara, Esq. ("Hara 11/4/20 Decl."), Exh. K (Decl. of Dan Hlavachek) at ¶¶ 9-11.] Graves tried to convince Bade-Castro and Gay that they should all go to work for another laboratory and take their client accounts with them.  [S&G's Summary Judgment Opp., Decl. of Stefanie Bade-Castro in lieu of Testimony under Direct

_____

        [2] The 2/17/21 Order is available at 2021 WL 621429.  On March 4, 2021, S&G moved for reconsideration of the order; the motion for reconsideration was denied in a March 19, 2021 order. [Dkt. nos. 132, 148.]

Examination ("Bade-Castro 12/28/20 Decl.") at ¶¶ 2-4, 6-9.]
Bade-Castro, however, ultimately executed a new S&G employment
contract, and she told Dr. Puana about her discussions with
Graves about moving to Aloha Toxicology.  [Id. at ¶ 10; Puana
12/28/20 Decl. at ¶ 30.]

S&G initiated this action on June 13, 2019.  [Dkt.
no. 1.]  The original Complaint alleged: a claim under the
Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1832,
1836(b)(1); a claim under the Hawai`i Uniform Trade Secrets Act
("HUTSA"), Haw. Rev. Stat. Chapter 482B; and a breach of
contract claim.

On June 19, 2019, S&G filed a motion seeking a
preliminary injunction.  [Dkt. no. 12.]

On August 19, 2019, Graves filed his answer to the
Complaint, which included a counterclaim and a third-party
complaint against Dr. Puana and Bade-Castro.  [Dkt. no. 35.]

An evidentiary hearing on the motion for a preliminary
injunction was held on August 30, 2019, [Minutes, filed 8/30/19
(dkt. no. 42),] and the motion was ultimately denied, [Order
Denying Pltf.'s Motion for Preliminary Injunction, filed
11/25/19 (dkt. no. 60) ("11/25/19 Order")].[3]

---

[3] The 11/25/19 Order is also available at 2019 WL 6311356.

On March 1, 2020, S&G filed its First Amended Complaint.  [Dkt. no. 63.]  The First Amended Complaint alleges: the DTSA claim ("Count I"); the HUTSA claim ("Count II"); a breach of contract claim based on competition against S&G ("Count III"); a breach of contract claim based on solicitation of subordinates to move to S&G's competitor ("Count IV"); a breach of contract claim based on Graves's urging his subordinates to refuse to execute their new contracts ("Count V"); a breach of contract claim based on the creation of a sexually hostile work environment, thereby exposing S&G to civil liability ("Count VI"); a breach of contract claim based on his disparagement of S&G's ownership and management in a vulgar and profane manner ("Count VII"); a breach of contract claim based on Graves's misrepresenting himself as one of S&G's owners/partners ("Count VIII"); and a claim for declaratory relief related to the alleged breaches of contract ("Count IX").

On May 6, 2020, Graves filed his answer to the First Amended Complaint, which included a Second Amended Counterclaim and a First Amended Third-Party Complaint.  [Dkt. no. 72.]  The Second Amended Counterclaim asserts: a claim for attorney's fees under the DTSA provision, 18 U.S.C. § 1836(b)(3)(D), that allows for an award of reasonable attorney's fees to the prevailing defendant, if the plaintiff brought the DTSA claim in bad faith ("Counterclaim Count I"); a claim for attorney's fees under the

7

comparable provision of the HUTSA, Haw. Rev. Stat. § 482B-5(1) ("Counterclaim Count II"); breach of contract ("Counterclaim Count III"); breach of the implied covenant of good faith and fair dealing ("Counterclaim Count IV"); unjust enrichment ("Counterclaim Count V"); a claim seeking payment of unpaid wages, pursuant to Haw. Rev. Stat. Chapter 388 ("Counterclaim Count VI"); tortious interference with prospective business advantage ("Counterclaim Count VII"); a claim seeking injunctive relief ("Counterclaim Count VIII"); a claim seeking declaratory relief ("Counterclaim Count IX"); a wrongful termination claim, pursuant to HWPA ("Counterclaim Count X"); and a wrongful termination claim based on violation of public policy ("Counterclaim Count XI").

The First Amended Third-Party Complaint alleges the following claims: a defamation claim against Bade-Castro ("Third-Party Count I"); a defamation per se claim against Dr. Puana ("Third-Party Count II"); a defamation/commercial disparagement claim against Dr. Puana ("Third-Party Count III"); a tortious interference with prospective business advantage claim against Dr. Puana and Bade-Castro ("Third-Party Count IV"); a tortious interference with contract claim against Dr. Puana and Bade-Castro ("Third-Party Count V"); a claim seeking injunctive relief ("Third-Party Count VI"); and a claim seeking declaratory relief ("Third-Party Count VII").

In the 2/17/21 Order, summary judgment was granted in favor of Graves as to all of the claims in the First Amended Complaint.  2021 WL 621429, at *17.  At that point, no party had moved for summary judgment as to the claims in either Graves's Second Amended Counterclaim or his First Amended Third-Party Complaint.  On June 10, 2021, the Court approved the parties' stipulation to dismiss Counterclaim Count VII and Third-Party Count IV with prejudice.[4]  [Dkt. no. 204.]  The purpose of the current briefs and the S&G Parties' Motion is to identify the claims that will be before the jury at trial.

## DISCUSSION

### I.   Trade Secrets Brief

Counterclaim Counts I and II are statutory claims for the Court, and not the jury, to determine.  With respect to S&G's trade secret claims in Counts I and II, the 2/17/21 Order stated:

> However, S&G has presented no evidence which raises a genuine issue of fact as to the question of whether either its monthly testing volume, testing contracts with insurance companies, or compensation structure is information that has actual or potential economic value because it is not generally known.  Further, in light of S&G's representation that it lacks sufficient admissible and probative evidence of damages associated with its trade secrets claims, this Court finds that there are no genuine issues of

---

[4] To the extent that the S&G Parties' Motion seeks summary judgment as to Counterclaim Count VII and Third-Party Count IV, the motion is denied as moot.

> material fact as whether S&G's testing volume,
> insurance company contracts, and commission
> structure was information that had economic
> value.  S&G cannot carry its burden of proof at
> trial as to an essential element of its DTSA
> claim and its HUTSA claim - that a trade secret
> exists.  Because there is no genuine issue of
> material fact for trial, Graves is entitled to
> judgment as a matter of law as to Count I and
> Count II.

2021 WL 621429, at *11 (citation omitted).  Graves's position is
that, based on this Court's rulings as to Counts I and II, he is
entitled to judgment in his favor as to Counterclaim Counts I
and II.

### A.  **Bad Faith Standard**

The civil remedies provision of the DTSA states:

> In a civil action brought under this subsection
> with respect to the misappropriation of a trade
> secret, a court may -
>
> > . . . .
>
> > (D)  if a claim of the misappropriation is
> > made in bad faith, which may be established
> > by circumstantial evidence, a motion to
> > terminate an injunction is made or opposed
> > in bad faith, or the trade secret was
> > willfully and maliciously misappropriated,
> > award reasonable attorney's fees to the
> > prevailing party.

18 U.S.C. § 1836(b)(3).  The HUTSA provides, in relevant part:
"The court may award reasonable attorney's fees to the
prevailing party if: (1) A claim of misappropriation is made in
bad faith[.]"  Haw. Rev. Stat. § 482B-5.  Neither the DTSA nor
the HUTSA defines what constitutes bad faith.  Graves notes that

10

courts within the Ninth Circuit require that the trade secrets claim be objectively specious and that the party, subjectively, either brought or maintained the claim in bad faith. [Trade Secrets Brief at 16-17 (quoting Swarmify, Inc. v. Cloudfare, Inc., No. C 17-06957 WHA, 2018 WL 4680177, at *2 (N.D. Cal. Sep. 28, 2018) (citing CRST Van Expedited, Inc. v. Werner Enterprises, Inc., 479 F.3d 1099, 1111 (9th Cir. 2007))) and (citing Berry v. Haw. Express Serv., No. 03-cv-00385 SOM/LEK, 2007 U.S. Dist. LEXIS 15077, at *46 (D. Haw. Mar. 2, 2007)).]

       CRST was decided under California law.  479 F.3d at 1102.  In reviewing the district court's award of attorneys' fees to the defendant as to the misappropriation of trade secrets claim, the Ninth Circuit noted:

> Cal. Civ. Code § 3426.4 (2004) provides in part:
>
>> If a claim of misappropriation is made in bad faith, a motion to terminate an injunction is made or resisted in bad faith, or willful and malicious misappropriation exists, the court may award reasonable attorney's fees to the prevailing party.
>
> The California Court of Appeal has interpreted the statute's "bad faith" element to require "objective speciousness of the plaintiff's claim . . . and its subjective bad faith in bringing or maintaining the claim."  Gemini Aluminum Corp. v. California Custom Shapes, Inc., 95 Cal. App. 4th 1249, 1262, 116 Cal. Rptr. 2d 358 (2002).

479 F.3d at 1111 (footnote omitted).  The Ninth Circuit held that it was permissible for the district court to apply Cal.

Civ. Code § 3426.4, and the district court's imposition of an award of attorneys' fees was not an abuse of discretion under the facts of the case.  Id. at 1111-12.

This district court has stated:

> Like Hawaii, "California has adopted without significant change the Uniform Trade Secrets Act." DVD Copy Control Ass'n, Inc. v. Bunner, 75 P.3d 1, 9 (Cal. 2003).  In Gemini Aluminum Corp. v. California Custom Shapes, Inc., 95 Cal. App. 4th 1249, 1262, (Cal .App. 2002), the California Court of Appeals noted that, under California's Uniform Trade Secrets Act ("CUTSA"), a defendant may recover attorneys' fees "[i]f a claim of misappropriation is made in bad faith."  Because the CUTSA "does not define 'bad faith,'" the court held that "'bad faith' for purposes of [the CUTSA] requires objective speciousness of the plaintiff's claim, as opposed to frivolousness, and its subjective bad faith in bringing or maintaining the claim." Id.  "An objectively specious claim is one that is completely unsupported by the evidence or one that lacks proof as to one of its essential elements." JLM Formation, Inc. v.. [sic] Form Pac, No. C 04-1774 CW, 2004 WL 1858132, at *2 (N.D. Cal. Aug. 19, 2004).  "Subjective misconduct exists where a plaintiff knows or is reckless in not knowing that its claim for trade secret misappropriation has no merit." Id.  "A court may determine a plaintiff's subjective misconduct by examining evidence of the plaintiff's knowledge during certain points in the litigation and may also infer it from the speciousness of a plaintiff's trade secret claim." Id.

Berry v. Haw. Express Serv., Inc., Civ. No. 03-00385 SOM/LEK, 2007 WL 689474, at *13 (D. Hawai`i Mar. 2, 2007) (some alterations in Berry), aff'd sub nom. Berry v. Dillon, 291 F. App'x 792 (9th Cir. 2008).  This district court concluded that

Hawai`i courts were likely to apply the same analysis that the
California courts, as well as the Michigan and Maryland courts,
use - "objective speciousness and subjective misconduct." Id.
at *15.  The Ninth Circuit affirmed the award of attorneys' fees
to the prevailing defendant "[b]ecause there was no evidentiary
foundation for the trade secret misappropriation claim[.]"
Berry, 291 F. App'x at 795 (citing Haw. Rev. Stat. § 482B-5(1)).

However, a more recent Ninth Circuit decision suggests
a different result.  In RJB Wholesale, Inc. v. Castleberry, the
Ninth Circuit noted that both the DTSA and the Washington
Uniform Trade Secrets Act ("WUTSA") allowed for an award of
reasonable attorney's fees to a prevailing defendant where the
trade secrets claim was made in bad faith.  788 F. App'x 565,
566 (9th Cir. 2019) (citing Wash. Rev. Code § 19.108.040; 18
U.S.C. § 1836(b)(3)(D)).  The Ninth Circuit held that the
district court erred in looking to the California state courts'
analysis for what constitutes bad faith because,

> outside the [W]UTSA, Washington has recognized
> that attorneys' fees may be awarded "on the
> equitable grounds of . . . bad faith,"
> specifically for: (1) prelitigation misconduct;
> (2) procedural bad faith; and (3) substantive bad
> faith.  Rogerson Hiller Corp. v. Port of Port
> Angeles, 96 Wash. App. 918, 982 P.2d 131, 135
> (1999).  Prelitigation misconduct is "obdurate or
> obstinate conduct that necessitates legal action
> to enforce a clearly valid claim or right,"
> procedural bad faith is "vexatious conduct during
> the course of litigation," and subjective bad
> faith "occurs when a party intentionally brings a

13

> frivolous claim, counterclaim, or defense with
> improper motive." Id. at 136 (citations
> omitted).

Id. (some alterations in RJB).  The Ninth Circuit held that the
district court erred in ruling that Castleberry was entitled to
attorney's fees under that bad faith analysis.  Id.

This Court is inclined to find that RJB indicates that
the Ninth Circuit would reverse the use of the objectively
specious and subjective bad faith analysis in this case if the
Hawai`i state courts have a different definition of bad faith
outside of the trade secret context.  The Hawai`i Supreme Court
has "declined to uphold awards under the bad-faith exception
absent both clear evidence that the challenged actions are
entirely without color, and are taken for reasons of harassment
or delay or for other improper purposes and a high degree of
specificity in the factual findings of the lower courts." Bank
of Haw. v. Kunimoto, 91 Hawai`i 372, 390, 984 P.2d 1198, 1216
(1999) (citation omitted).  "Bad faith has also been 'defined as
actual or constructive fraud or a neglect or refusal to fulfill
some duty . . . not prompted by an honest mistake as to one's
rights or duties, but by some interested or sinister motive.'"
Id. (some internal quotation marks omitted) (quoting In re
Estate of Marks, 91 Wash. App. 325, 957 P.2d 235, 241 (1998)
(addressing attorney's fees in a probate action) (some internal
quotation marks omitted) (ellipses in original)) and (citing In

14

re CARL Corp., 85 Hawai`i 431, 451-52, 946 P.2d 1, 21-22 (1997)

(holding that reckless conduct, under Hawai`i Administrative

Rule § 3-126-36(c) (1995), constituted bad faith)).  However,

ultimately, it is not necessary for this Court to decide whether

the objective speciousness and subjective misconduct standard or

the actual or constructive fraud or neglect standard applies

because the result in this case would be the same under either

standard.

### B.   **Application to the Facts of this Case**

The evidence that has been presented shows that, at

the time S&G filed its original Complaint on June 13, 2019:

Graves had a supervisory position with S&G; he and Dr. Puana

were engaged in negotiations regarding a new employment

agreement; he was dissatisfied with the new terms that Dr. Puana

was proposing; and he was looking into employment possibilities

with an S&G competitor.  Graves's Employment Agreement that was

in effect at that time stated:

> During the Employee's employment with the
> Company, the Employee will not, directly or
> indirectly, individually or as a consultant to,
> or an employee, officer, director, manager,
> stockholder, partner, member or other owner or
> participant in any business entity, other than
> the Company, engage in or assist any other person
> or entity to engage in any business which
> competes with the Company's Business, regardless
> of where that business is located, unless
> mutually agreed upon and documented.

[Graves 11/4/20 Decl., Exh. A (Employment Agreement) at ¶ 7(a).]

       S&G's Count I alleged:

       Defendant Graves, with intent to convert trade
       secrets related to services provided by Plaintiff
       S&G LABS to its clients, in or intended for use
       in interstate or foreign commerce, to the
       economic benefit of someone other than S&G LABS,
       the owner thereof, and intending or knowing that
       such activity will injure S&G LABS as the owner
       of that trade secrets, did knowingly and without
       authorization appropriate, take, carry away, and
       conceal such trade secrets; attempted to do so;
       and conspired with another person to do so.

[Complaint, filed 6/13/19 (dkt. no. 1), at ¶ 24 (emphases in

original).]  Count I also alleged Graves "without authorization

did transmit, deliver, communicate, or convey trade secret

information to someone other than S&G LABS, the lawful owner of

the trade secret information; attempted to do so; and conspired

with another person to do so." [Id. at ¶ 25 (emphasis in

original).]  Similarly, Count II alleged Graves

       misappropriated and improperly disclosed trade
       secrets belonging to Plaintiff S&G LABS by
       actually, or threatening to disclose trade
       secrets information, including a formula,
       pattern, compilation, program, device, method,
       technique, or process that derives independent
       economic value, actual or potential, from not
       being generally known to, and not being readily
       ascertainable by proper means by, other persons
       who can obtain economic value from its disclosure
       or use; and has been the subject of efforts by
       the owner of that information that are reasonable
       to maintain its secrecy.

[Id. at ¶ 28 (emphasis in original).]  In light of Graves's

position at S&G and his inquiry with an S&G competitor during

his contract negotiations, this Court cannot find that S&G's

16

trade secrets claims were either objectively specious or brought as a result of fraud or neglect.

Nor did the filing of Graves's Counterclaim and the proceedings related to S&G's motion for preliminary injunction indicate that S&G was pursuing an objectively specious claim or pursuing a claim out of fraud or neglect.  Graves argued S&G's trade secrets claims were "baseless," and the Complaint failed to "describe exactly what trade secrets or confidential information that [S&G] contends Graves used, disclosed, or otherwise misappropriated."  [Def. Darren Graves' Counterclaim Against Pltf. S&G Labs Hawaii, LLC, a Hawaii Limited Liability Company, filed 8/19/19 (dkt. no. 35-1), at pg. 8 (emphasis omitted).]  Counterclaim Counts I and II asserted Graves was entitled to attorneys' fees under the DTSA and HUTSA because S&G brought its trade secrets claims in bad faith.  [Id. at ¶¶ 53-64.]  However, these allegations can be construed as zealous advocacy.  The fact that S&G continued to pursue its trade secrets claims after Graves filed the Counterclaim does not show that S&G was pursuing the claims in bad faith, either under the objective speciousness and subjective misconduct standard or under the actual or constructive fraud or neglect standard.

At the hearing on the motion for preliminary injunction, S&G's counsel conceded, "[n]othing has actually happened yet," following Graves's alleged threat to take all of

S&G's clients and put S&G out of business. [8/30/19 hrg. trans., filed 9/23/19 (dkt. no. 54), at 93.] S&G's counsel characterized the motion for preliminary injunction as a "prophylactic" measure, "trying to get ahead of the problem rather than have to live with the problem and then come [to this Court after the problem materializes to obtain] relief." [Id. at 89.] This Court denied S&G's motion for preliminary injunction because S&G failed to establish that it was likely to suffer irreparable harm without a preliminary injunction. 11/25/19 Order, 2019 WL 6311356, at *8. Because the motion for preliminary injunction was ultimately resolved based on the irreparable harm issue, this Court did not address whether S&G was likely to succeed on the merits of the trade secrets claims. Id. ("Because [S&G] has not established irreparable harm, it is not necessary to address the other requirements for a preliminary injunction."). Thus, neither the evidence presented, the arguments of counsel, nor the rulings by this Court regarding S&G's motion for preliminary injunction establish that S&G was pursuing the trade secrets claims in bad faith, either under the objective speciousness and subjective misconduct standard or under the actual or constructive fraud or neglect standard.

In response to Graves's motion for summary judgment on all of S&G's claims, S&G conceded that it "lack[ed] sufficient

admissible and probative evidence that it has suffered monetary damages as a result of Graves's conduct." [S&G's Summary Judgment Opp. at 11.]  S&G therefore stated that it would "be seeking to dismiss [Counts I and II] ahead of trial." [Id.]  By the time he filed his reply in support of his motion for summary judgment ("Graves's Summary Judgment Reply"), Graves had not been contacted by S&G about the dismissal of Counts I and II, and he therefore continued to seek summary judgment as to those claims.  [Graves's Summary Judgment Reply, filed 12/31/20 (dkt. no. 103), at 7 n.1 (citing Graves's Summary Judgment Reply, Decl. of Counsel at ¶ 5).]  At the January 15, 2021 hearing on Graves's motion for summary judgment, S&G's counsel stated "S&G Labs can't prove that it has lost money as a result of" Graves's "conversations and communications and information discussed" with S&G's competitor, and counsel stated he was "skipping past" those claims in the argument.  [1/15/21 hrg. trans. at 6.[5]]  S&G's counsel also stated:

> I raise the issue of if we drop out the trade secret claim, we are not with only state law --
>
> THE COURT:  Once they drop out, they move for summary judgment, they're going to be the -- they're going to be the prevailing party.  You guys have not dismissed it up to this point, so

---

[5] The January 15, 2021 hearing transcript was designated as Trial Exhibit 67.  See S&G Parties' Errata Filing Re Objections to Proposed Exhibits of Counter-claimant Darren Graves, filed 4/2/21 (dkt. no. 172), Exh. 67.

> they're going to be the prevailing party on those
> claims . . . .
>
>     MR. SHIPLEY:  I understand that, Your
> Honor. . . .

[Id. at 9-10.]  There is no indication in the record that S&G

sought to dismiss Counts I and II during the period between the

hearing on Graves's motion for summary judgment and the issuance

of the 2/17/21 Order.  The 2/17/21 Order noted:

> S&G asks this Court to deny the portion of the
> Motion seeking summary judgment as to Counts I
> and II because S&G intends to dismiss those
> claims.  However, since filing its memorandum in
> opposition on December 28, 2020, S&G has taken no
> action to effectuate its stated intent to dismiss
> Counts I and II.  This Court will therefore
> address the merits of the Motion as to Counts I
> and II.

2021 WL 621429, at *8.

     Because S&G failed to act upon its December 28, 2020

representation that it was going to dismiss Counts I and II,

those claims remained at issue in this case until this Court

granted summary judgment to Graves.  Thus, S&G effectively

continued to litigate those claims after it had conceded that it

could not prevail on them.  This required Graves to, *inter alia*,

prepare substantive arguments regarding Counts I and II in his

Summary Judgment Reply and for presentation during the hearing

on his motion for summary judgment.  The Court therefore finds

that S&G's inaction after its concession that it could not

prevail on Counts I and II constituted bad faith prosecution of

20

those claims, under either the objective speciousness and subjective misconduct standard or the actual or constructive fraud or neglect standard.  As to the first standard, S&G forced Graves to continue to litigate the trade secrets claims after December 28, 2020, even though the claims were objectively specious, and S&G's inaction after representing in a public filing that it was going to dismiss Counts I and II constituted subjective misconduct.  As to the second standard, S&G's failure to pursue its stated intent to dismiss Counts I and II constituted actual neglect.

C.    **Ruling**

Although it is not entirely clear whether the Ninth Circuit would apply the objective speciousness and subjective misconduct standard or the actual or constructive fraud or neglect standard in this case, it is not necessary for this Court to decide which standard applies because the result would be the same under either standard.  Graves has established that S&G pursued its DTSA claim and its HUTSA claim in bad faith after December 28, 2020, but he has failed to establish bad faith prior to that point.  Graves is entitled to an award of the reasonable attorneys' fees and costs that he incurred defending against Counts I and II after December 28, 2020.

Graves is directed to file a motion for attorney's fees and costs addressing the amount of the award, in compliance

21

with the requirements of Local Rule 54.2.  The motion shall be filed after the entry of the final judgment in this case to allow the award of attorney's fees to be determined together with, or as an off-set of, any other award of attorney's fees associated the other claims in this case.

## II.  **EKRA Issues**

In the EKRA Brief, Graves seeks rulings that: 1) the issue of what, if any, effect EKRA had on his Employment Agreement is an issue of law to be determined by this Court; and 2) any exhibits and testimony addressing that issue will be inadmissible during the jury trial.  The S&G Parties' Motion seeks summary judgment in favor of S&G as to Counterclaim Counts III and VI, in light of the effect of EKRA on Graves's Employment Agreement.

### A.  **Additional Background**

Dr. Puana states that, "[i]n late 2018 or early 2019," her "business attorney," David Vaughn, Esq. ("Vaughn"), told her "a new federal criminal law had gone into effect making it illegal for medical lab businesses such as S&G Labs to base employee compensation on any formula resulting in wage payments that varied from month to month depending on the number of tests performed or revenue received for testing."  [S&G Parties' Motion, Decl. of Lynn Puana, M.D. ("Puana 5/28/21 Decl.") at ¶ 4.]  She therefore decided that she could not continue to pay

Graves according to the terms of his Employment Agreement because doing so could expose her, S&G, and S&G's employees to criminal liability.  [Id. at ¶ 5.]  Dr. Puana

> advised Graves in mid-May that [they] needed to reach agreement on new compensation terms before the payroll date for the first pay period in May 2019 so that he could be paid.  When no such agreement was reached, [she] instructed our payroll company to pay Graves an amount equal to what his pay would be under the $1 million annual salary offer that was pending.

[Id. at ¶ 13.]  Dr. Puana told Graves his pay would be retroactively adjusted based upon his agreed-upon annual salary once they signed a new contract.  [Id.]  This is consistent with the testimony and evidence that Graves previously offered in support of his motion for summary judgment.  See Graves 11/4/20 Decl. at ¶¶ 16-17; see also id., Exh. E (emails dated 5/15/19 between Dr. Puana and Graves).

When Dr. Puana suspended Graves on June 14, 2019, she "directed that his wage payment be reduced to bi-monthly payments based on the $50,000 annual salary set forth in his existing employment contract[,]" because he had not agreed to a new contract and "his future employment with S&G Labs [was] in doubt[.]"  [Puana 5/28/21 Decl. at ¶ 14.]  Graves received that amount until his termination.  [Id.]

Counterclaim Count III alleges S&G breached Graves's Employment Agreement by reducing his compensation, beginning

May 20, 2019, to the approximate periodic equivalent of a

$1 million annual salary, and then again on July 5, 2019, to the

periodic equivalent of a $50,000 annual salary. [Second Amended

Counterclaim at ¶¶ 77-78.] Counterclaim Count VI alleges that

the failure to pay him according to the terms of the Employment

Agreement constituted a violation of Haw. Rev. Stat.

Chapter 388. [Id. at ¶¶ 91-95.] Neither Counterclaim Count III

nor Counterclaim Count VI mentions the issue of a severance

payment. This Court therefore does not construe those claims as

alleging S&G breached Graves's Employment Contract and violated

Chapter 388 by failing to make a severance payment when it

terminated him. Graves seeks an order requiring S&G to make the

severance payment, but this is a form of the relief that he

requests in Second Amended Counterclaim as a whole. See id. at

¶ 106 (Counterclaim Count VIII states: "S&G Labs continues to

wrongfully withhold the severance payment due to Graves for

terminating his employment without cause, which amounts to

approximately $1.8 million per the terms of the Contract."); id.

at PageID #: 832, Relief Sought ¶ 4 (praying for: "An order that

S&G Labs pay the amounts due to Graves under the employment

contract, including unpaid compensation and severance.").

**B.    Whether the Employment Agreement Violates EKRA**

S&G's position is that the commission-based

compensation scheme under Graves's Employment Agreement became

illegal and unenforceable when EKRA took effect.  What, if any, effect EKRA had on Graves's Employment Agreement is an issue of law for this Court to determine.  EKRA states:

> (a)  Offense.--Except as provided in subsection (b), whoever, with respect to services covered by a health care benefit program, in or affecting interstate or foreign commerce, knowingly and willfully--
>
>> (1)  solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind, in return for **referring a patient or patronage** to a recovery home, clinical treatment facility, or laboratory; or
>>
>> (2)  pays or offers any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind--
>>
>>> (A)  to induce a **referral of an individual** to a recovery home, clinical treatment facility, or laboratory; or
>>>
>>> (B)  in exchange for **an individual using the services** of that recovery home, clinical treatment facility, or laboratory,
>
> shall be fined not more than $200,000, imprisoned not more than 10 years, or both, for each occurrence.

18 U.S.C. § 220(a) (emphases added).

For purposes of § 220, "the term 'laboratory' has the meaning given the term in section 353 of the Public Health Service Act (42 U.S.C. 263a)[.]" 18 U.S.C. § 220(e)(4).  42 U.S.C. § 263a(a) states:

> the term "laboratory" or "clinical laboratory"
> means a facility for the biological,
> microbiological, serological, chemical, immuno-
> hematological, hematological, biophysical,
> cytological, pathological, or other examination
> of materials derived from the human body for the
> purpose of providing information for the
> diagnosis, prevention, or treatment of any
> disease or impairment of, or the assessment of
> the health of, human beings.

S&G is a medical laboratory testing facility that performs urinalysis screening for legal substances, as well as for controlled substances, for physicians, substance abuse treatment centers, and other types of organizations.  [Puana 12/28/20 Decl. at ¶ 4.]  This Court therefore finds that S&G is a laboratory for purposes of EKRA.

Dr. Puana testified she believed that, if S&G continued to pay Graves under the terms of his Employment Agreement, it would violate EKRA, *i.e.*, § 220(a)(2).  See Puana 5/28/21 Decl. at ¶ 5.  Neither EKRA's definitions subsection nor the definition section of Title 18, Part I, Chapter 11 (which EKRA is a part of) defines "remuneration" and "individual."  See § 220(e); 18 U.S.C. § 202.  These terms

> "must be read in [its] context and with a view to
> [its] place in the overall statutory scheme,"
> Food & Drug Admin. v. Brown & Williamson Tobacco
> Corp., 529 U.S. 120, 133, 120 S. Ct. 1291, 146 L.
> Ed. 2d 121 (2000) (quoting Davis v. Mich. Dep't
> of Treasury, 489 U.S. 803, 809, 109 S. Ct. 1500,

103 L. Ed. 2d 891 (1989)),[6] because an act
should "be interpreted as a symmetrical and
coherent regulatory scheme, one in which the
operative words have a consistent meaning
throughout," Gustafson v. Alloyd Co., 513 U.S.
561, 569, 115 S. Ct. 1061, 131 L. Ed. 2d 1
(1995).

Ctr. for Biological Diversity v. Bureau of Land Mgmt., 833 F.3d

1136, 1143 (9th Cir. 2016) (alterations in Ctr. for Biological

Diversity).  Thus, these terms in EKRA are read in the context

of the anti-kickback statute, 42 U.S.C. § 1320a-7b(b), which

criminalizes certain remunerations in federal health care

programs.  Section 1320a-7b(b) states, in pertinent part:

(1)  Whoever knowingly and willfully solicits or
receives any remuneration (including any
kickback, bribe, or rebate) directly or
indirectly, overtly or covertly, in cash or in
kind--

(A)  in return for referring an individual
to a person for the furnishing or arranging
for the furnishing of any item or service
for which payment may be made in whole or in
part under a Federal health care program, or

(B)  in return for purchasing, leasing,
ordering, or arranging for or recommending
purchasing, leasing, or ordering any good,
facility, service, or item for which payment
may be made in whole or in part under a
Federal health care program,

shall be guilty of a felony and upon conviction
thereof, shall be fined not more than $100,000 or
imprisoned for not more than 10 years, or both.

---

[6] Brown & Williamson has been superseded by statute on other
grounds.  See, e.g., Nicopure Labs, LLC v. Food & Drug Admin.,
944 F.3d 267, 272 (D.C. Cir. 2019).

(2)  Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person--

> (A)  to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>
> (B)  to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $100,000 or imprisoned for not more than 10 years, or both.

Section 1320a-7b is part of title 42, chapter 7, and the definitions section for chapter 7 states: "The term 'person' means an individual, a trust or estate, a partnership, or a corporation."  42 U.S.C. § 1301(a)(3).  Thus, for purposes of the anti-kickback statute, an "individual" is not an artificial entity.  Section 1301(c) states:

> Whenever under this chapter or any Act of Congress, or under the law of any State, an employer is required or permitted to deduct any amount from the **remuneration** of an employee and to pay the amount deducted to the United States, a State, or any political subdivision thereof, then for the purposes of this chapter the amount so deducted shall be considered to have been paid to the employee at the time of such deduction.

(Emphasis added.) Remuneration therefore includes payment by an employer to an employee. Because § 1320a-7b(b)(1) and (2) address similar conduct and have similar language to § 220(a), the terms "remuneration" and "individual" in EKRA will be interpreted to have the same meaning that they have in the anti-kickback statute.

In light of that construction, this Court finds that Graves's compensation from S&G constitutes remuneration under EKRA. Section 220(a)(2)(B) does not apply because the remuneration was not paid in exchange for Graves's use of S&G's laboratory services. The critical issue is whether Graves's remuneration was "to induce a referral of an individual to" S&G. See § 220(a)(2)(A). Undoubtedly, Graves's commission-based compensation structure induced him to try to bring more business to S&G, either directly through the accounts he serviced himself, or through the accounts of the personnel under his management. However, the "client" accounts they serviced were not **individuals** whose samples were tested at S&G. Their "clients" were "the physicians, substance abuse counseling centers, or other organizations in need of having persons tested." See Puana 12/28/20 Decl. at ¶ 6. However, S&G was not compensated by those "clients"; S&G was "compensated for the testing services on a 'per test' basis by third party insurers, government agencies under the Medicare and Medicaid programs,

and direct 'self-pay' by some individuals." [Id. at ¶ 5.]
There is no evidence that Graves's client accounts included
individuals who self-paid for S&G to perform urinalysis on their
samples. See, e.g., Puana 5/28/21 Decl. at ¶ 16 ("In late
March, 2019, Graves' single biggest client, CARE Hawaii, ended
its relationship with S&G Labs."); id. at ¶¶ 17-22 (describing
changes to HMSA's scope of coverage and stating that, in May
2019, she offered Graves a $1 million annual salary based on her
estimates of how S&G's revenue would decline because of the loss
of CARE Hawaii and HMSA's coverage changes).[7]  Because Graves was
not working with individuals, the compensation that S&G paid him
was not paid to induce him to refer individuals to S&G.[8]

        EKRA's exception provision does state that § 220(a)
does not apply to

        a payment made by an employer to an employee or
        independent contractor (who has a bona fide
        employment or contractual relationship with such
        employer) for employment, if the employee's
        payment is not determined by or does not vary by-
        -

                (A)  the number of individuals referred to a
                particular recovery home, clinical treatment
                facility, or laboratory;

_____

        [7] Graves's commission-based compensation was more than
$1.8 million in 2018.  [Puana 5/28/21 Decl. at ¶ 15.]

        [8] Even if Graves's client accounts included individual
physicians, those individuals were not the ones being referred
to S&G for analysis of their samples.

> (B)   the number of tests or procedures
> performed; or
>
> (C)   the amount billed to or received from,
> in part or in whole, the health care benefit
> program from the individuals referred to a
> particular recovery home, clinical treatment
> facility, or laboratory;

Section 220(b)(2).  Graves's commission-based compensation from
S&G was a payment made by an employer to an employee, and it was
determined based upon the number of tests that S&G performed.
Thus, the exception in § 220(b)(2) would not apply to Graves's
compensation under his Employment Agreement.  However, that does
not mean his compensation violated EKRA.  The exception is only
relevant if there is a violation of the provisions of § 220(a)
in the first instance.  Because Graves's compensation did not
violate § 220(a), the § 220(b)(2) exception is irrelevant to
this case.  This Court therefore concludes, as a matter of law,
that the compensation provisions of Graves's Employment
Agreement did not violate EKRA.[9]

### C.   **Effect of the Court's Ruling**

Because the compensation provisions of Graves's
Employment Agreement did not violate EKRA, this Court concludes
that, as a matter of law that: S&G breached Graves's Employment

---

[9] In light of the Court's ruling, it is not necessary to
address the issue of whether a compensation provision that
violates EKRA is severable from the rest of the contract or
whether it renders the entire contract void.

Agreement by unilaterally reducing his periodic compensation and failing to pay the commissions described in the agreement; and the unilateral reduction and failure to pay commissions also violated Haw. Rev. Stat. Chapter 388.  Graves is therefore entitled to judgment as a matter of law, with respect to liability only, as to Counterclaim Counts III and VI.  At trial, the jury will determine the amount of damages Graves suffered as a result of the breach and the Chapter 388 violation, subject to any legal ruling that a portion of the damages sought as to Counterclaim Counts III and VI are duplicative.  To the extent that it seeks summary judgment in favor of S&G as to Counterclaim Counts III and VI, the S&G Parties' Motion is denied.

        At trial, Dr. Puana will be allowed to testify that she believed the commission-based compensation provisions in Graves's Employment Agreement and in the agreements of the other members of the S&G sales team violated EKRA, and she will be allowed to testify regarding the actions she took because of that belief.  This Court will instruct the jury that Dr. Puana's belief was incorrect.  Dr. Puana will not be permitted to testify that Vaughn advised her that the commission-based

compensation provisions violated EKRA,[10] nor will any party be permitted to introduce exhibits reflecting Dr. Puana's consultation with Vaughn about the effect of EKRA.

## III. **Wrongful Termination Issues**

In the Wrongful Termination Brief, Graves urges this Court to rule that he has established his prima facie case for Counterclaim Count X (wrongful termination in violation of HWPA) and to enter judgment in his favor as to liability for Counterclaim Count XI (wrongful termination in violation of public policy).

### A.   **HWPA Claim**

HWPA states:

An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because:

(1)  The employee, or a person acting on behalf of the employee, reports or is about to report to the employer, or reports or is about to report to a public body, verbally or in writing, a violation or a suspected violation of:

(A)  A law, rule, ordinance, or regulation, adopted pursuant to law of this State, a political subdivision of this State, or the United States . . . ,

---

[10] The S&G Parties previously confirmed that Vaughn would not be called as a witness at trial.  See Minutes - EP: Trial Status Conference, filed 4/7/21 (dkt. no. 183).

> unless the employee knows that the report is
> false[.]

Haw. Rev. Stat. Ann. § 378-62.  This Court has stated:

> A § 378-62 claim has three requirements.
> First, an employee must have "engaged in
> protected conduct" as defined by HRS § 378-62(1).
> Griffin v. JTSI, Inc., 654 F. Supp. 2d 1122, 1131
> (D. Hawai`i 2008) (citing Crosby v. State Dept.
> of Budget & Fin., 76 Hawai`i 332, 342, 876 P.2d
> 1300, 1310 (1994)).  Second, the employer must
> take some "adverse action" against the employee.
> Id.  And third, there must be "a causal
> connection between the alleged retaliation and
> the 'whistleblowing.'"  Id.  To meet the causal
> connection requirement, an "employer's challenged
> action must have been taken 'because' the
> employee engaged in protected conduct."  Id.  In
> Crosby, the Supreme Court of Hawai`i adopted the
> McDonnell-Douglas [Corp. v. Green, 411 U.S. 792
> (1973),] burden shifting framework for HWPA
> claims.  Therefore, a plaintiff can prove
> retaliation either through direct evidence, or by
> demonstrating that her protected activity played
> a role in the adverse employment action.  Chan v.
> Wells Fargo Advisors, LLC, 124 F. Supp. 3d 1045,
> 1055 (D. Hawai`i 2015).  The defendant employer
> can then defend by showing that the adverse
> employment action would have occurred regardless
> of the protected activity.  Id.

Bach v. Cmty. Ties of Am., Inc., CIV. No. 18-00103 LEK-WRP, 2019

WL 6054675, at *10 (D. Hawai`i Nov. 15, 2019), aff'd, 840 F.

App'x 182 (9th Cir. 2021).

In connection with Graves's motion for summary

judgment, the parties agreed that, on August 2, 2019, Graves

sent an email to Dr. Puana ("8/2/19 Email"), arguing that

suspending him and reducing his compensation was unjustified and

was a hardship on his family.  [Graves's CSOF at ¶ 38; S&G's

34

Summary Judgment Opp. at 2 (admitting Graves's ¶ 38).]  Graves

stated, in pertinent part:

> On or about May 1st, you verbally told me that
> you made the decision to pay me a yearly salary
> of $1,000,000.00 - far less than my contractual
> [sic] compensation set forth in my employment
> contract.  Soon after, on may [sic] 20th, you
> began paying me $39,583 per bi-monthly pay check
> which equates to roughly $949,992[.]
>
> Then, on July 5th, 2019 without ANY notice, you
> began paying me only $2.083 per pay period or
> $4,166 per month.  This is a 95% reduction in my
> monthly compensation!  Clearly, my family and I
> cannot live on $4,166 per month and I need my pay
> reinstated.  Please correct the July 5th and July
> 20th payroll entries and provide me with the
> compensation you promised to pay me under my
> Employment Agreement.
>
> . . . .
>
> Please provide me with the appropriate back wages
> for July as well as confirm that my paychecks
> going forward will reflect my compensation per
> the Employment Agreement. . . .
>
> I just want what was promised me in my Employment
> Agreement.  No more.  No less. . . .

[Graves 11/4/20 Decl., Exh. G (8/2/19 Email) (emphases

omitted).]

Graves argues the 8/2/19 Email and the filing of his

original Counterclaim on August 19, 2019 constituted protected

activity for purposes of HWPA.  In the 8/2/19 Email, Graves

informed Dr. Puana that he believed S&G was improperly

withholding compensation that he was entitled to under the

Employment Contract.  Even if the 8/2/19 EO shows that Graves

35

suspected S&G was violating "[a] law, rule, ordinance, or regulation," his report of the suspected violation to Dr. Puana does not constitute a report to a public body, nor does the 8/2/19 Email indicate Graves was about to report the suspected violation to a public body.  See Haw. Rev. Stat. § 378-61 (definition of "Public body").

Graves's original Counterclaim alleged, *inter alia*, that S&G's failure to pay him all of the compensation he was due under his Employment Agreement constituted a violation of Haw. Rev. Stat. Chapter 388.  [Counterclaim at ¶¶ 84-88.]  "The judiciary and any member or employee of the judiciary" are included within the definition of a "[p]ublic body" for purposes of the HWPA.  Section 378-61 ("Public body" at ¶ 6).  Thus, Graves's filing of his original Counterclaim constituted protected activity for purposes of HWPA.  Graves's termination on September 9, 2019 constituted an adverse employment action.  See Hara 11/4/20 Decl., Exh I (9/9/19 email from S&G's counsel to Graves's counsel, transmitting the Termination Letter).

The adverse employment action occurred approximately three weeks after Graves's protected activity.  The Court also notes that S&G issued the Termination Letter while S&G's motion for preliminary injunction was pending before this Court, but this Court had already indicated it was inclined to deny the motion.  See 8/30/19 hrg. trans. at 95-99.  This temporal

36

proximity is sufficient circumstantial evidence of a causal
connection for purposes of Graves's prima case for his HWPA
claim.  See Bach, 2019 WL 6054675, at *11 ("In a HWPA analysis,
a plaintiff is permitted to use temporal proximity as
circumstantial evidence that the plaintiff's protected conduct
was a substantial or motivating factor in the adverse employment
action." (citing Griffin v. JTSI, Inc., 654 F. Supp. 2d 1122,
1132 (D. Hawai`i 2008))); Chan v. Wells Fargo Advisors, LLC, 124
F. Supp. 3d 1045, 1056 (D. Hawai`i 2015) (denying summary
judgment in part on temporal proximity when the time between the
protected activity and the first adverse action was
approximately fifteen days, and the ultimate adverse action was
within approximately fifty days).  This Court therefore
concludes that Graves has established a prima facie case for his
HWPA claim.

       "[O]nce the employee makes its prima facie showing,
the employer must then 'defend affirmatively by showing that the
termination would have occurred regardless of the protected
activity.'"  Griffin, 654 F. Supp. 2d at 1132 (quoting Crosby,
76 Hawai`i at 342, 876 P.2d at 1310) (some internal quotation
marks omitted).  The Termination Letter sets forth seven
categories of conduct that S&G asserted constituted grounds for
it to terminate Graves's employment for cause.  [Hara 11/4/20
Decl., Exh. I at PageID #: 1410-12.]  All of these grounds are

unrelated to the August 19, 2019 filing of the Counterclaim. Throughout this case, Graves has denied making the statements attributed to him in the Termination Letter, and he has asserted he was never given the opportunity to respond to the allegations described in the letter.  See, e.g., Graves 11/4/20 Decl. at ¶ 22 ("At no time did I make any negative or derogatory comments about [Dr. Puana], S&G, or any S&G employee to any individual or entity outside of S&G."); id. at ¶ 30 ("I was not contacted by [Dr. Puana] or any other S&G representative to discuss those allegations.  I was not given any opportunity to respond to the complaints alleged against me.").  S&G does not dispute that Dr. Puana did not discuss the allegations in the Termination Letter with Graves.  See Puana 12/28/20 Decl. at ¶ 43 ("I chose not to review these issues with Graves while he was suspended.").  This Court therefore finds that there are genuine issues of material fact as to S&G's defense that it would have terminated Graves's employment regardless of his protected activity.  The issues related to S&G's defense will be presented to the jury.  Further, there are genuine issues of material fact as to Graves's damages associated with his HWPA claim, and the issue of damages will also be presented to the jury.

B.   ***Parnar* Claim**

This district court has stated:

> In _Parnar v. Americana Hotels, Inc._, the
> Hawai`i Supreme Court established a common-law
> cause of action through which an individual
> employee may bring a tort claim against his or
> her former employer if the employee can prove
> "that the discharge violates a clear mandate of
> public policy."  652 P.2d 625, 631 (Haw. 1982).
> The purpose of a _Parnar_ claim is to provide
> compensation to a plaintiff for wrongful acts
> that public policy would deem to be compensable,
> but that the legislature has not provided for
> remediating under the law.  _Shahata v. W Steak_
> _Waikiki, LLC_, 721 F. Supp. 2d 968, 987 (D. Haw.
> 2010) (noting that "[w]rongful termination
> claims" are usually only raised where "a
> statutory or other policy does not itself provide
> for a remedy to enforce the policy" (citing
> _Griffin_, 654 F. Supp. 2d at 1139–40)), _aff'd_, 494
> F. Appx. 729 (9th Cir. 2012).  As such, if "the
> statutory or regulatory provisions which evidence
> the public policy themselves provide a remedy for
> the wrongful discharge, provision of a further
> remedy under the public policy exception is
> unnecessary."  _Ross v. Stouffer Hotel, Co._, 879
> P.2d 1037, 1047 (Haw. 1994) (quoting _Lapinad v._
> _Pac. Oldsmobile-GMC_, 679 F. Supp. 991 (D. Haw.
> 1988)).

_Assaye v. United Airlines, Inc._, No. CV 17-00495 DKW-KSC, 2018
WL 1975678, at *11 (D. Hawai`i Apr. 26, 2018) (alteration in
_Assaye_).

Hawai`i law allows a plaintiff to bring a _Parnar_ claim
based on the public policy identified in HWPA - the protection
of whistleblowers.  _Cruz v. Kaumana Drive Partners, LLC_, Civ.
No. 19-00255 JMS-KJM, 2020 WL 7698820, at *5 (D. Hawai`i Apr. 2,
2020) (citing _Ross v. Stouffer Hotel Co._, 76 Hawai`i 454, 464,
879 P.2d 1037, 1047 (1994) (providing the HWPA as an example of
"a clear expression of legislative intent" to permit a _Parnar_

claim along with an HWPA claim despite the statutory remedy); Griffin, 654 F. Supp. 2d at 1140-41 (applying Ross and explaining that in HRS § 378-69, "the Hawaii legislature provided specifically that claims for discharge in violation of the HWPA do not preclude a plaintiff from also alleging a simultaneous Parnar claim")).  Where warranted by the evidence, the plaintiff who prevails on a Parnar claim may obtain

> tort recovery, [which] may generally include special damages, which compensate claimants for specific out of pocket financial expenses and losses, general damages for pain, suffering, and emotional distress, In Re Hawaii Federal Asbestos Cases, 734 F. Supp. 1563 (1990), and punitive damages assessed for the purpose of punishing the defendant for aggravated or outrageous misconduct and to deter defendant and others from similar conduct in the future.  See Masaki v. General Motors, 71 Haw. 1, 780 P.2d 566, *recon. denied*, 71 Haw. 664, 833 P.2d 899 (1989).

Norris v. Hawaiian Airlines, Inc., 74 Haw. 235, 264, 842 P.2d 634, 647 (1992), *aff'd*, 512 U.S. 246 (1994).

For the reasons set forth above regarding Graves's HWPA claim, this Court also concludes that Graves has established a prima facie case for his Parnar claim and that there are triable issues of fact regarding S&G's defense to the claim and Graves's damages.

## IV.  **Defamation Claims**

The S&G Parties' Motion seeks summary judgment as to Third-Party Counts I, II, and III.

A.   __Third-Party Count I__

        Third-Party Count I alleges a defamation claim against

Bade-Castro based on the following allegations:

        63.  Castro published knowingly false
        statements about Graves to [Dr.] Puana in or
        around June 2019 regarding Graves' alleged
        disclosure of S&G Labs' trade secrets.

        64.  Castro told [Dr.] Puana that Graves
        described to the owner of a competing company the
        commission structure of their S&G Labs'
        compensation, S&G Labs' equipment, internal
        operational details (e.g. volume of monthly
        business), internal systems related to turn-
        around time, and other operational information.

[First Amended Third-Party Complaint at PageID #: 849.]  In

Hawai`i there are

        four elements necessary to sustain a claim for
        defamation:

                (1)  a false and defamatory statement
                concerning another;

                (2)  an unprivileged publication to a third
                party;

                (3)  fault amounting at least to negligence
                on the part of the publisher [actual malice
                where the plaintiff is a public figure]; and

                (4)  either actionability of the statement
                irrespective of special harm or the
                existence of special harm caused by the
                publication.

        Gold v. Harrison, 88 Hawai`i 94, 100, 962 P.2d
        353, 359 (1998). . . .

Gonsalves v. Nissan Motor Corp. in Hawai`i, 100 Hawai`i 149,

171, 58 P.3d 1196, 1218 (2002) (some alterations in Gonsalves).

It is undisputed that Graves engaged in discussions with Aloha Toxicology about possible employment. The parties disagree about what Graves disclosed or said about S&G during those discussions. Compare Graves 11/4/20 Decl. at ¶¶ 19-21, with Bade-Castro 12/28/20 Decl. at ¶¶ 5-8. However, that dispute of fact is not material to the disposition of Third-Party Count I. See Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."); In re Barboza, 545 F.3d 702, 707 (9th Cir. 2008) (stating "a dispute is 'material' only if it could affect the outcome of the suit under the governing law" (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986))).

As part of the analysis of whether the allegedly defamatory communication was unprivileged,

> the Court must determine, as a matter of law, whether the alleged defamatory communication is entitled to a qualified privilege. Vlasaty v. Pacific Club, 4 Haw. App. 556, 562, 670 P.2d 827, 832 (1983). A qualified privilege "arises when the author of the defamatory statement reasonably acts in the discharge of some public or private duty, legal, moral, or social, and where the publication concerns subject matter in which the author has an interest and the recipients of the publication a corresponding interest or duty." Aku v. Lewis, 52 Haw. 366, 371, 477 P.2d 162, 166 (1970). See also Russell v. American Guild of Variety Artists, 53 Haw. 456, 497 P.2d 40 (1972); Vlasaty at 562, 670 P.2d 827. In claiming such

> privilege, it is essential that the author of the
> defamatory matter and the recipients have a
> common interest and the communication is of a
> type reasonably deemed to protect or further that
> interest.  Vlasaty at 562, 670 P.2d 827.

Uema v. Nippon Express Haw., Inc., 26 F. Supp. 2d 1241, 1248-49

(D. Hawai`i 1998) (footnote omitted).  However, regardless of

whether a qualified privilege exists as a matter of law,

> a finding of a qualified privilege is
> insufficient to grant summary judgment.  Rather,
> the qualified privilege is conditional and lost
> if it is abused.  [Vlasaty, 4 Haw. App. at 562,
> 670 P.2d 827.]  A qualified privilege may be
> abused by the use of words not reasonably
> believed necessary to protect the particular
> interest for which the privilege is given. . . .
> Abuse of the qualified privilege is a
> determination to be made by the trier of fact.
> Calleon v. Miyagi and MTL, Inc., 76 Hawai`i 310,
> 319, 876 P.2d 1278, 1287 (1994); Vlasaty at 562,
> 670 P.2d 827.

Id. at 1249.

According to Bade-Castro, Graves told her about his

discussions with Aloha Toxicology and invited her to participate

in those discussions on more than one occasion because he was

attempting to convince her to leave S&G with him.  [Bade-Castro

12/28/20 Decl. at ¶¶ 2, 4.]  Graves has admitted in his answer

to the First Amended Complaint that "he reached out to another

laboratory" and "he invited Bade-Castro to participate in the

calls and that she declined to do so."  [Answer to Plaintiff's

First Amended Complaint Filed March 1, 2020 [Doc 63], filed

5/6/20 (dkt. no. 72), at ¶ 72.]  On June 6 or 7, 2019, Bade-

Castro told Dr. Puana about Graves's efforts to find employment with another laboratory.  [Bade-Castro 12/28/28 Decl. at ¶ 10; Puana 5/28/20 Decl. at ¶ 25.]  As of the filing of the S&G Parties' Motion, Bade-Castro remained employed as an S&G account representative.  See Bade-Castro 5/28/21 Decl. at ¶¶ 22-23.

Even viewing the record in the light most favorable to Graves as the nonmoving party,[11] Bade-Castro acted reasonably, in her capacity as an account representative for S&G, when she reported Graves's discussions with Aloha Toxicology to Dr. Puana.  Dr. Puana is the owner of S&G, and, at the time of Bade-Castro's disclosure, Graves was an S&G manager.  [Puana 12/28/20 Decl. at ¶ 2; Graves's CSOF at ¶ 3; S&G's Summary Judgment Opp. at 2 (admitting Graves's CSOF ¶ 3).]  Graves managed the other S&G account executives, including Bade-Castro.  See Graves's CSOF at ¶¶ 6-7; S&G's Mem. in Opp. at 2 (admitting Graves's CSOF ¶¶ 6-7); Graves 11/4/20 Decl., Exh. A (Employment Agreement) at 7 (Schedule A - Compensation) at ¶ 2.c (discussing the "client accounts managed by employees whom [Graves] has the responsibility of managing").  Bade-Castro made the statements about Graves, her manager, to Dr. Puana, the owner of the company, in the discharge of a private duty in her capacity as

---

[11] In considering a motion for summary judgment, a court must view the record in the light most favorable to the non-moving party.  Crowley v. Bannister, 734 F.3d 967, 976 (9th Cir. 2013).

an S&G employee.  Further, both Bade-Castro and Dr. Puana had an interest in protecting S&G from suffering losses if Graves left the company.  See Aku, 52 Haw. at 371, 497 P.3d at 166.  The disclosure by Bade-Castro was a reasonable means to further their common interest.  See Vlasaty, 4 Haw. App. at 562, 670 P.2d at 832.  This Court therefore concludes that, as a matter of law, Bade-Castro's statements in June 2019 to Dr. Puana about Graves's discussions with Aloha Toxicology are entitled to a qualified privilege.

Although the qualified privilege can be lost through abuse, and abuse is generally an issue for the trier of fact, see Calleon, 76 Hawai`i at 319, 876 P.2d at 1287, Graves has not identified any evidence that suggests Bade-Castro abused the qualified privilege.  This Court therefore: finds that there is no genuine issue of material fact as to the issue of abuse of the qualified privilege; and concludes that Bade-Castro is entitled to judgment as a matter of law as to Third-Party Count I because the allegedly defamatory statements at issue in that claim are entitled to a qualified privilege, which has not been lost.  The S&G Parties' Motion is granted as to Third-Party Count I.

B.   **Third-Party Counts II and III**

Third-Party Counts II and III both arise from allegedly defamatory statements Dr. Puana made about Graves to

45

persons associated with his client accounts.  Third-Party

Count II is a defamation per se claim against Dr. Puana based on

the following allegations:

> 78.  [Dr.] Puana published knowingly false
> statements about Graves to his customers in or
> around June 2019 regarding Graves' alleged
> disclosure of S&G Labs' trade secrets.
>
> 79.  Specifically, Puana stated that Graves
> is no longer with S&G Laboratories because he
> violated federal trade secret laws, stole
> employees, and that she would be filing a federal
> lawsuit against him.  These statements were
> false, and caused the customer to believe Graves'
> employment with S&G Labs was terminated, while he
> was still employed with S&G Labs.

[First Amended Third-Party Complaint at pgs. 18-19.]  Third-

Party Count III is a defamation/commercial disparagement claim

against Dr. Puana, based on the same conduct as Third-Party

Count II.  See id. at ¶¶ 92-93.

**A.    Defamation Per Se**

> Under Hawaii law, defamation per se includes
> statements that "impute to a person the
> commission of a crime" and statements that "have
> a tendency to injure him in his office,
> profession, calling or trade."  Partington v.
> Bugliosi, 825 F. Supp. 906, 915 (D. Haw. 1993)
> (citing Butler v. United States, 365 F. Supp.
> 1035, 1044 (D. Haw. 1973)).

Isaac v. Daniels, CIVIL NO. 16-00507 DKW-RLP, 2018 WL 1903606,

at *6 (D. Hawai`i Mar. 30, 2018), *report and recommendation*

*adopted*, 2018 WL 1902543 (Apr. 20, 2018).  Further,

> if a writing is defamatory per se, a plaintiff's
> injury is presumed and the plaintiff can recover

46

> damages without needing to allege and prove
> special damages. <u>Partington</u>, 825 F. Supp. at 915
> (noting that if a writing is defamatory per se,
> it is actionable without allegation of special
> damages); <u>Kahanamoku v. Advertiser Pub. Co.</u>, 25
> Haw. 701 (1920) (explaining that if a plaintiff
> establishes libel per se, "injury to the
> plaintiff will be presumed and special damages
> need not be alleged or proven, but general and
> punitive damages may be recovered.").

<u>Isaac v. Daniels</u>, CIVIL NO. 16-00507 DKW-RLP, 2017 WL 2962890,
at *8 (D. Hawai`i June 23, 2017), *report and recommendation
adopted*, 2017 WL 2960511 (July 11, 2017).

Dr. Puana states that, after Bade-Castro informed her
about Graves's discussions with Aloha Toxicology, she "decided
to take steps immediately to protect S&G Labs' business and its
employees [because she] knew that Graves could resign with
little or no notice, begin work immediately with Aloha
Toxicology and start making efforts to convince S&G Labs'
accounts to move with him." [Puana 5/28/21 Decl. at ¶ 30.]
Further, on Friday, June 14, 2019, after she suspended Graves,
Dr. Puana began making telephone calls to the client accounts
that Graves had been handling. She continued to make such calls
through the weekend, and eventually the other remaining members
of the S&G sales team helped her contact the accounts. [<u>Id.</u> at
¶¶ 31-32.] According to Dr. Puana, her "purpose in doing so was
to advise the representatives of those accounts who dealt with
S&G Labs that any communications with S&G Labs should be

directed to one of the other sales team members," and those
representatives were primarily told to contact Bade-Castro or
Dr. Puana.  [Id. at ¶ 31.]  On June 17, 2019, Dr. Puana and
Bade-Castro went to Maui, and from that day to June 21, 2019
they held in-person meetings with some Maui accounts and
continued to make some contacts by telephone.  [Id. at ¶ 32.]

Dr. Puana states only "a small number" of the account
representatives who they contacted asked questions about the
situation, and she

> told them that disputes had arisen, that [she]
> had filed lawsuit under trade secret protection
> statutes, and that Graves was suspended from
> serving as an S&G Labs account representative
> until the issues were resolved.  [She does] not
> recall a single conversation with any client
> extending beyond those generalities.  No client
> or client representative asked for – nor were any
> given – detailed explanations about the events
> and disputes between S&G Labs, Graves, and Aloha
> Toxicology.

[Id. at ¶ 33.]  Dr. Puana denies telling anyone that Graves had
been terminated or "let go" by S&G.  [Id. at ¶ 34.]  Bade-
Castro's testimony is similar to Dr. Puana's.  See Bade-Castro
5/28/21 Decl. at ¶¶ 17-20.

Graves states some of his clients told him that,
during those meetings with Dr. Puana and/or Bade-Castro, "they
were informed that [Graves] would no longer be servicing them
and/or that [he] had been 'let go' from S&G."  [Graves 11/4/20
Decl. at ¶ 26.]  Although the record must be construed in the

light most favorable to Graves as the nonmoving party, only admissible evidence may be considered on summary judgment.  See Weil v. Citizens Telcom Servs. Co., 922 F.3d 993, 998 (9th Cir. 2019).  Graves's testimony about statements that unidentified persons made to about him statements either Dr. Puana or Bade-Castro made to them is hearsay, and Graves has not established that any exceptions to the rule against hearsay applies.  See generally Fed. R. Evid. 801 through 804.  Thus, Graves's testimony alone is insufficient to establish a genuine issue of material fact as to Third-Party Count II.

Graves also cites a declaration that he submitted in opposition to S&G's motion for a preliminary injunction, and he notes that Dr. Puana's and Bade-Castro's current declarations are inconsistent with their prior testimony.  [Graves's mem. in opp. to the S&G Parties' Motion, filed 6/10/21 (dkt. no. 203), at 30-31.]  At the time of his declaration, Taylor Yap ("Yap") was the office manager at Valley Isle Healthcare ("Valley Isle") in Wailuku, Maui.  [Decl. of Taylor Yap (dated 8/6/19) ("Yap Decl."), filed 8/15/19 (dkt. no. 32-20), at ¶ 2.]  Yap's understanding was that Valley Isle brought its business to S&G primarily because of a desire to work with Graves.  [Id. at ¶ 5.]  Yap stated that, on June 19, 2019, against Yap's wishes, Dr. Puana and Bade-Castro visited Valley Isle.  When an S&G employee told him Dr. Puana wanted to visit Valley Isle, he told

49

the employee that he did not want Dr. Puana to visit that day
because neither he nor another Valley Isle manager would be
there.  [Id. at ¶¶ 7-9.]  Dr. Puana and Bade-Castro "brought
treats and informed [Yap's] staff that [Graves was] no longer
working with S&G . . . ."  [Id. at ¶ 9.]  Later that day,
Dr. Puana called Yap, and she "apologized for visiting despite
[Yap's] wishes, and explained that [Graves was] no longer with
S&G Laboratories because he violated federal trade secret laws,
stole employees, and that she would be filing a federal lawsuit
against him."  [Id. at ¶ 10.]  Yap understood Dr. Puana's
comments to mean that S&G had terminated Graves's employment.
[Id. at ¶ 11.]

As to Graves's argument that the Puana 5/28/21
Declaration and the Bade-Castro 5/28/21 Declaration are
inconsistent with their prior statements, the record does
contain prior statements by Dr. Puana and Bade-Castro that are
not entirely consistent with their testimony in their May 28,
2021 declarations.  Dr. Puana stated during discovery:

> Beginning on June 16, 2019, I did communicate
> with each S&G Labs client to inform them
> generally that Darren Graves would no longer be
> an account representative, and identified for
> them who they should contact with respect to
> their testing needs.  **I do not recall specifics**
> **as to individual conversations**, however, I do
> recall that the subject of a federal lawsuit
> having been filed being mentioned without
> discussing details, and that as a result of that
> Darren would no longer communicate on behalf of

                     S&G Labs in response whenever a client asked for
                     an explanation.

[Hara 11/4/20 Decl., Exh. O (Dr. Puana's answers to interrogs., Verification dated 8/12/20) at pg. 6 (emphasis added).]  Bade-Castro's response was similar.  [Id., Exh. P (Bade-Castro's answers to interrogs., Verification dated 9/29/20) at pg. 5.] However, this Court cannot make credibility determinations or weigh the evidence in the record when ruling on a motion for summary judgment.  See Estate of Lopez ex rel. Lopez v. Gelhaus, 871 F.3d 998, 1009 n.10 (9th Cir. 2017) ("At the summary judgment stage, '[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" (alteration in Lopez) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986))).

      The Yap Declaration is testimony, presented under penalty of perjury, that Dr. Puana imputed to Graves the violation of federal trade secret laws and stealing S&G employees.  These are allegations that: were ultimately shown to be false; and would tend to injure Graves in his profession as a sale representative in the drug testing industry.  In considering the S&G Parties' Motion, this Court cannot determine whether Yap is more credible than Dr. Puana and Bade-Castro, nor whether his testimony should be given more weight than theirs.

This Court therefore finds that, viewing the record in the light most favorable to Graves, there are genuine issues of material fact as to his defamation per se claim against Dr. Puana.  The S&G Parties' Motion must be denied as to Third-Party Count II.

    **B.**   **<u>Defamation</u>**

       Viewing the record in the light most favorable to Graves, Yap's testimony would satisfy the first element of the traditional defamation claim, Dr. Puana made false and defamatory statements about Graves.  As to the second element, Dr. Puana made those statements to Yap, a third party.  <u>See</u> <u>Gold</u>, 88 Hawai`i at 100, 962 P.2d at 359 (listing the elements of a defamation claim).  Dr. Puana's statements that Graves was no longer servicing Valley Isle's account and that any communications with S&G would be conducted through Bade-Castro would arguably be subject to a qualified privileged because they were made in the furtherance of a private duty, based on their common interest in the professional relationship between S&G and Valley Isle.  <u>See</u> <u>Aku</u>, 52 Haw. at 371, 477 P.2d at 166; <u>Vlasaty</u>, 4 Haw. App. at 562, 670 P.2d at 832.  However, there is a genuine issue of fact as to whether that privilege was lost through abuse because Dr. Puana told Yap that Graves was not servicing the account because Graves violated federal trade secret laws and stole S&G employees.  <u>See</u> <u>Calleon</u>, 76 Hawai`i at 319, 876 P.2d at 1287.  Further, there are genuine issues of

52

fact as to whether Dr. Puana was at least negligent in making those statements and as to the issue of harm.

This Court therefore finds that, viewing the record in the light most favorable to Graves, there are genuine issues of material fact as to his defamation/commercial disparagement claim against Dr. Puana.  The S&G Parties' Motion must be denied as to Third-Party Count III.

<div align="center">**CONCLUSION**</div>

For the foregoing reasons, the S&G Parties' Motion for Summary Judgment as to Counts Three, Six, and Seven, of the Second Amended Counterclaim, and Counts One Through Four of the First Amended Third Party Complaint, filed May 28, 2021, is GRANTED IN PART AND DENIED IN PART.  The S&G Parties' Motion is: GRANTED insofar as summary judgment is granted in favor of Bade-Castro as to Third-Party Count I; DENIED AS MOOT as to Counterclaim Count VII and Third-Party Count IV; and DENIED as to Counterclaim Count III, Counterclaim Count VI, Third-Party Count II, and Third-Party Count III.

Further, this Court rules that: Graves is entitled to judgment as a matter of law as to Counterclaim Counts I and II; Graves's recovery as to Counterclaim Counts I and II will be determined in a post-judgment motion for attorney's fees and costs; Graves is entitled to judgment as a matter of law as to liability for Counterclaim Counts III and VI; the issue of

damages as to Counterclaim Counts III and VI will be decided at trial; Graves has established his prima facie case as to Counterclaim Count X and his prima facie case as to Counterclaim Count XI; and the issues of S&G's defenses and Graves's damages as to Counterclaim Counts X and XI will be decided at trial.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, October 18, 2021.



/s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

**S&G LABS HAWAII VS. DARREN GRAVES; CV 19-00310 LEK-WRP; ORDER: RULING ON THE PARTIES' PRETRIAL BRIEFS; AND GRANTING IN PART AND DENYING IN PART THE S&G PARTIES' MOTION FOR SUMMARY JUDGMENT**